Calvin LOWE *v.* STATE of Arkansas

CR 91-280                                830 S.W.2d 864

Supreme Court of Arkansas
Opinion delivered May 26, 1992

*Baim, Gunti, Mouser, De Simone & Robinson*, by: *Greg Robinson*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. The appellant, Calvin Lowe, was convicted of two counts of capital murder and was sentenced to life without parole. On appeal, he argues that a) he did not intelligently, knowingly, and voluntarily waive his *Miranda* rights or voluntarily give his statement, and b) the presence of two police officers in the room during the voir dire of individual panel members tainted the process and effectively deprived him of a fair trial.

We affirm the convictions and sentences.

On Saturday morning, September 29, 1990, the appellant, age twenty-nine and a resident of Pine Bluff, and two other men named Theatrice Hunter and Vincent Hinds traveled to Watson Chapel to a horseshoe shop known as the Forge for the purpose of robbing the owner, Jim Linzy. They arrived at the shop at about 8:30 a.m. Upon entering, the appellant ordered two men, Jim Linzy and Burt Burgess, to lie on the floor, according to one accomplice, and then shot them both with a .22 pistol in the head. Both men died. About $900 was taken from the two wallets. The appellant set fire to Jim Linzy's wallet and threw it out of the car on the ride home.

Two days later, on October 1, 1990, at 9:00 p.m., the appellant, accompanied by family members, voluntarily surrendered to the Pine Bluff Police Department. On arriving, he was handcuffed to a chair for fifty-five minutes by Detective Ron Ursery while waiting for Lieutenant Brad King, who was assigned to the case, to finish another assignment. He was not read his *Miranda* rights at this time.

At 9:55 p.m., Lieutenant King and Sergeant John Scarlet took the appellant to an interview room and read him his rights from a standard form. Lieutenant King wrote "yes" beside each separate *Miranda* right on the form as the appellant answered in the affirmative. He then asked Lowe to initial each answer on the form, which the appellant did. King next asked the appellant if he knew why he was there, and Lowe answered, "Well I understand something about a robbery." King proceeded to explain why the appellant was there and asked him questions. The officer was not aware that the appellant had low intelligence.

After fifteen minutes of questioning, King transported the

appellant to State Police Headquarters. There, State Police Investigator John Howell interviewed him, after first advising him of his rights. Howell wrote in "Yes Sir" beside each *Miranda* right on the form, and the appellant initialed it. The time stated on the waiver form was 11:00 p.m. Both Sergeant Nathaniel Clark of the State Police and Investigator Howell talked with the appellant, together and separately. The appellant first denied being at the site where the murders were committed. Sergeant Clark then visited with him alone for about thirty minutes. After that, the appellant gave a statement to Howell in which he admitted having been at the Forge but denied doing the shooting.

After this discussion, Howell obtained a tape recorder for Sergeant Clark to take a taped statement. Sergeant Clark talked with the appellant for about twenty or thirty minutes and then took a statement from him which he thought was being taped; the tape recorder, however, was not functioning properly. The following morning, October 2, 1990, beginning at 2:01 a.m., Sergeant Clark taped a second statement. This time the machine was in working order. The interview was concluded at about 2:30 a.m. that same morning. Sergeant Clark testified that he did not know whether the appellant understood the questions or not but assumed that he did from his responses. Sergeant Clark did not know anything about the appellant's mental abilities when he took the statement.

The appellant subsequently moved to suppress his statement on grounds that he did not knowingly and intelligently waive his constitutional rights and that the statement itself was coerced. Hearings were held on the motion on May 6, 1991, and May 20, 1991. Evidence at the hearings revealed that the appellant had progressed through the twelfth grade in special education classes. At the second hearing, the appellant testified that after he denied killing Jim Linzy at the Forge, Investigator Howell jumped up and beat on the desk and said he was "a damn liar." He further testified that Sergeant Clark, who was black, asked him whether he felt better talking to him than to the white officers. Clark, he said, then added that he had been out to the appellant's house and was told that the appellant's mother wanted him to tell everything he knew and to tell the truth. Investigator Howell and Sergeant Clark denied that any coercion took place.

On cross examination, the appellant admitted that he had been in trouble three times and that each time he was read his *Miranda* rights. He also said that he had seen *Miranda* rights read on television. He interpreted the right to remain silent as meaning that you do not have to say anything.

There was additional testimony at the May 20, 1991 hearing about the appellant's intelligence level. Dr. Douglas Stevens testified for the defense that, after administering several tests, he concluded that the appellant operated verbally in the mentally retarded range and non-verbally in the borderline mentally retarded range. Academically, he was below a third-grade level. He stated, too, that he expected that the appellant would have a general understanding of his *Miranda* rights when they were read to him but would have difficulty putting them into his own words.

Dr. Kelly Eldridge testified for the State and identified herself as a psychological examiner at the Southeast Arkansas Mental Health Center. She concluded, after administering her own tests, that the appellant's verbal abilities were in the range of mild mental retardation and that his non-verbal abilities were in the borderline mental retardation range. She also testified that if the appellant had not comprehended his *Miranda* rights, he knew enough to say so. He operated in the nine-year-four-month-old child's range, according to Dr. Eldridge. Based on these facts, the circuit court denied the appellant's motion to suppress.

Trial commenced on May 21, 1991, and the appellant requested individual voir dire. The court then entertained an objection by the appellant and a request to limit the number of deputies in the voir dire room to one instead of two, so that the jurors would not feel intimidated. The appellant did not extend his objection to the estimated ten deputies present in the courtroom. The court denied the request and stated that security was left to the judgment of the sheriff and that he was not going to second-guess that decision absent some proof that the jurors felt intimidated.

At the ensuing trial, the death penalty was requested by the State. Theatrice Hunter testified that the appellant recommended the Forge as a place to be robbed and that he shot and killed both victims at the crime scene. The appellant first ordered the victims to lie on the floor, according to Hunter, and then shot

them in the head with a .22 pistol. The appellant's taped statement was played to the jury. The statement placed him at the location of the crime and revealed that he suggested the robbery and drove the borrowed car to the shop. The jury convicted the appellant on both counts of capital murder and assessed a sentence of life without parole.

We first consider the appellant's contention that his waiver and statement were coerced. He premises this argument on several allegations: a) he was handcuffed to a chair for fifty-five minutes and not read his *Miranda* rights; b) Investigator Howell struck the desk and called him a liar; c) Sgt. Clark suggested that he might be more comfortable talking with a black officer; d) Sgt. Clark visited his mother who told the sergeant that she wanted the appellant to tell all; and e) he was detained five hours before completing a taped statement.

■ Custodial statements are presumed involuntary, and the state has the burden of demonstrating their admissibility. *Weaver* v. *State*, 305 Ark. 180, 806 S.W.2d 615 (1991); *Moore* v. *State*, 303 Ark. 1, 791 S.W.2d 698 (1990). Here, the coercion alleged does not appear of the magnitude to require reversal. But, in addition, both officers refuted the appellant's testimony at the *Denno* hearing and, thus, the issue became one of credibility between the officers and the appellant. The circuit court has wide discretion where the issue is one of witness credibility, and any conflict in testimony is for the court to resolve. *State* v. *Massery*, 302 Ark. 447, 790 S.W.2d 175 (1990). The circuit court believed the officers in this case. On review, we cannot say that the court clearly erred in giving more credence to the officers' testimony. Cf. *Weaver* v. *State, supra.* We affirm the court's finding of no coercion.

■■ The appellant also claims that his statement should be suppressed because his intelligence level made comprehension of his *Miranda* rights impossible. On appeal, this Court reviews the totality of the circumstances surrounding a confession in determining whether an accused knowingly and intelligently waived his rights, and we reverse a circuit court only if its finding was clearly erroneous. *Segerstrom* v. *State*, 301 Ark. 314, 783 S. W. 2d 847 (1990). Factors to consider in determining an intelligent waiver include the age, experience, education, back-

ground, and intelligence of the accused. *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992). But a low intelligence quotient, in and of itself, will not render a waiver of rights involuntary where the evidence shows the waiver was knowing and voluntary. *See, e.g., Hill* v. *State*, 303 Ark. 462, 798 S.W.2d 65 (1990); *Burin* v. *State*, 298 Ark. 611, 770 S.W.2d 125 (1989); *Mitchell* v. *State*, 295 Ark. 341, 750 S.W.2d 936 (1988); *Hatley* v. *State*, 289 Ark. 130, 709 S.W. 2d 812 (1986); *Hignite* v. *State*, 265 Ark. 866, 581 S.W.2d 552 (1979).

The *Hill* case is analogous to the case at bar. Hill was twenty years old at the time of the crime. He was evaluated by a private psychologist and found to have a low I.Q., to be functioning at below a third-grade level, and to be mildly mentally retarded. He also had a tenth-grade education, consisting mainly of special education classes, and drove a car. Hill had been previously convicted of a felony, which gave him some familiarity with the criminal process. At the interrogation, he initialed each *Miranda* right and signed the waiver form before giving a statement. With these facts, we held that Hill's argument for reversal was not persuasive.

In the case before us, the appellant was twenty-nine and had completed special education classes through the twelfth grade. Capable of operating an automobile, he drove the borrowed car to the scene of the crime. The appellant testified at the suppression hearing and at trial and stated that he had been advised of his rights three times before in connection with other problems and had seen the procedure on television. He also testified that he knew the *Miranda* rights meant he did not have to say anything. The defense expert testified that the appellant operated verbally in the mentally retarded range but could generally understand his rights. The State's expert testified that he functioned as a nine-year-four-month-old child and if he had not understood his rights, he had the capability of asking the interrogator to clarify the matter. Based on this evidence, we cannot say that the circuit court clearly erred in finding a waiver and admitting the statement.

Appellant contends, as his next point, that the presence of the two officers during individual voir dire of panel members was prejudicial. At the trial, this exchange took place:

> Defense Counsel: . . . I would like for the record to state that off the record I addressed the Court on the issue of the fact that there seemed to be ten deputies in the courtroom, including the Sheriff himself, and that there are two deputies present in this room for individual voir dire, and that I believe that in itself has a prejudicial effect, gives a poor image to the Defendant. And I believe it is by design, and I believe it is not necessary, and would ask that the Court remove one of the deputies from this room. There is only one door in and one door out and so that the jurors, as they come in individually, do not feel intimidated. *I really have no motion towards the number of deputies in the courtroom. I believe there are at least two at every door and two additional.* (Emphasis ours.)

The circuit court responded that this was a security matter best left to the sheriff, and the court did not believe the presence of the officers was prejudicial.

We first note that although the appellant now raises the issue of the prejudicial effect of all deputies in the courtroom and in the voir dire room, he only preserved the issue of the two deputies inside the voir dire room for our review. We generally have held that guards or officers present during trial are appropriate unless the defendant can show prejudice. In a similar case, guards stood near the defendant during his trial. *See Glick* v. *State*, 286 Ark. 133, 689 S.W. 2d 559 (1985). We held that in light of the fact that the defendant was in court on an escape charge and was a high security risk, it was not prejudicial or obtrusive to have guards standing near him during trial.

The United States Supreme Court has spoken on the issue of officers in the courtroom. *See Holbrook, Superintendent, Massachusetts Correctional Institution* v. *Flynn*, 475 U.S. 560 (1986). In *Holbrook*, four uniformed officers sat in the front row of the spectator's section to supplement the customary security force, which was overextended at the time. Though the jurors stated that the officers' presence had no bearing on their ability to give the defendant a fair trial, the First Circuit Court of Appeals reversed the trial court's decision that the officers' presence was harmless, stating that the trial court had failed to consider whether the particular circumstances of the defendant's trial

called for the officers' presence and that the trial court had improperly relied on the jurors' voir dire responses to rebut any suggestion of prejudice.

The United States Supreme Court reversed the First Circuit, holding that the officers' presence was not so inherently prejudicial that he was denied his constitutional right to a fair trial; nor did it constitute an impermissible risk of prejudice. The Court stated:

> While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of guards.
>
> . . .
>
> However, "reason, principle, and common human experience," (citing authority) counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

475 U.S. at 569.

█ Similarly, in this case, we are not prepared to say that the presence of two officers in the room during individual voir dire is cause for reversal. The circuit court referred to security as a concern. The potential for disruption was understandable in light of the crime, which involved the execution-style slaying of two victims, where the death penalty was sought and where the testimony of an accomplice was contemplated against the appellant. The appellant points to nothing to show that the officers did anything other than sit or stand quietly in the room. We cannot say that their presence was inherently prejudicial or that it presented an unacceptable risk of prejudice.

Accordingly, we hold that there was no abuse of discretion by the circuit court in allowing the two officers to remain in the room for individual voir dire.

The record has been examined in accordance with Ark. Sup. Ct. R. 11(f), and it has been determined that there were no rulings adverse to the appellant which constituted prejudicial error.

Affirmed.