Timothy Allen OLIVER v. STATE of Arkansas

CR 94-113                                        907 S.W.2d 706

Supreme Court of Arkansas
Opinion delivered October 9, 1995
[Petition for rehearing denied November 13, 1995.*]

---

*Corbin and Brown, JJ., would grant.

10

*Dana A. Reece*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

BRADLEY D. JESSON, Chief Justice. The appellant, Timothy Oliver, was convicted of two counts of capital murder and sentenced to life without parole. On appeal, he asserts three points of error: (1) the trial court erred in refusing to hear all the evidence for his motion to suppress hearing and in admitting his confession into evidence when he could not have knowingly, voluntarily, and intelligently waived his constitutional rights; (2) the trial court erred in admitting his confession because it was the fruit of an unlawful arrest; and (3) jury misconduct, of which he was unaware until after trial, prejudiced his chances for a fair trial. We find no merit to his arguments and affirm.

On March 24, 1992, the bodies of Bobby and Charlene Friend were discovered in the bedroom of their home in DeQueen, Arkansas. Both husband and wife were victims of bludgeoning and multiple stab wounds. The Arkansas State Police attempted to locate the couple's adopted son, Michael, to inform him of the event. Charlene Friend's car, a silver Dodge Conquest, was missing from the residence and was later located in Hot Springs at a home where George Rhoades, a friend of Michael's, was living. At approximately 3:00 a.m. on March 25, 1992, Investigator Hayes McWhirter of the State Police stopped Rhoades and the appellant, Timothy Oliver, age fifteen, in Hot Springs. Both boys voluntarily went to the Hot Springs Police Department, where Oliver initially told McWhirter that he did not know where the city of DeQueen was located. A short while later, in the presence of his mother, Oliver gave the following statement in the absence of *Miranda* warnings:

> This is taken at 4 a.m. in the Hot Springs Police Department. On Saturday afternoon (March 21, 1992) around 5 p.m., me, Mike Friend, Mo-Jo (George Rhoades) and Ricky Dawson were in Mo-Jo's truck and went to DeQueen and the first place we stopped was at the skating rink. I went in to skate, Ricky was outside and Mo-Jo, or George, took Mike home. He was gone about 30 minutes. Mo-Jo came in and started skating. We got ready to leave the skating rink around 11 p.m. When I got outside, Mike was in the silver car. Me, Mo-Jo, Vickie and James Watson who lives in DeQueen went to the Pizza Hut. Mike wasn't with us. We ate pizza and had told Mike to meet us at the gas station. We met Mike at the gas station at DeQueen. We followed Mike back

to Hot Springs. He was driving the silver car. He turned off when we got to Hot Springs. We saw Mike Sunday afternoon and he spent the night at Mo-Jo's house Sunday night.

Oliver signed this statement and left the police station shortly after the interview. Later on the same date, Friend confessed to the double homicide of his parents and also implicated his three friends, Oliver, Rhoades, and Ricky Dawson. Oliver was arrested pursuant to a warrant the next day, March 26, 1992. After being verbally advised of his *Miranda* rights and signing a waiver-of-rights form, Oliver gave a detailed confession to police, which included the following:

Sometime back, Mike Friend talked to me, Mo-Jo, George Rhoades, and Ricky Dawson about wanting to kill his dad, Mike's dad. Mike has talked to all of us at different times about how to kill his step-father, Bobby. We have talked about using poison and shooting him. Friday night, 3/20 of '92, we were at George's house talking about going to DeQueen Saturday night. Saturday afternoon we were at George's house. We talked about how we were going to kill him and what everyone was going to use. I decided I would use the ball bat, George would use some type of two-bladed knife, sharp on both sides. Ricky was going to use a large stick about the length of a baseball bat and Mike was going to be using an aluminum sword, a practice sword. It was only sharp on the end. We all loaded up in George's truck and went to DeQueen. We hadn't been smoking or using any drugs or drinking. We got to DeQueen, and me and George got out at the skating rink. Mike and Ricky were in the truck riding around. Around 11 p.m., Mike and Ricky picked me and George up. We all went to Pizza Hut and had a pizza. After we left the Pizza Hut, we went straight to Mike's house. On the way out there, Mike told everyone what he wanted them to do. Mike had already told us in Hot Springs that his father had 3,000 dollars in his billfold, and that he would split the money with us to help him kill his dad. Mike told us he would go in the house first because he knew his dad had a gun under the mattress and would keep him from getting it. Mike went in the house first, then George, then me, and Ricky last. Mike went to his father's side of the bed. I was behind Mike. George was at the end of the bed by his moth-

er's side, and Ricky at the end of the bed. Ricky turned the light on and Mike started stabbing Dad as fast as he could. The end of the sword bent. His dad raised up and I hit him in the left side of the head above his eye. Mike took the bat from me and hit his dad in the head. I got the bat back and hit him in the head three more times while his head was laying on the nightstand. Ricky took the bat from me and hit the lady with it. She was face down when Ricky hit her. George hit the man in the head with the bat also before Ricky took the bat. I saw Ricky hit the lady twice with the bat. I guess George cut her throat because he had talked about it before we got to the house, and he had the razor blade or whatever it was. Mike was screaming at his dad. I guess he was cussing him out. Mike told Mo-Jo to hand him his mother's purse. Mike got the keys to the Chrysler out and some money. Mike already had some money in his hand from his dad's billfold. We then went to the front room, living room, Mike knocked the end table over and I knocked the VCR off the T.V. Me and Ricky ran down to the truck. I forgot to tell you earlier that we parked the truck down the road when we first got there and walked to the house. This way no one would see the truck at Mike's house. Mike and George ran around the side of the house for something, then I saw the headlights come on in the silver Conquest car. Mike flagged us down and told us to follow them to the gas station. I think we went to the gas station at the four way stop in DeQueen. When George got out of the car, he had changed pants. He had on a pair of shorts. While he was in the house, he had on long pants. Between DeQueen and Hot Springs we pulled over and threw everything in the woods. We threw the broken stick, sword, razor blade, and George's gloves in the woods. Everything is on the right hand side of the highway. I forgot to tell you, George had on a pair of gloves while he was in the house. We all then went back to Hot Springs to George's house. We didn't talk about it because every time it was mentioned, someone would say not talk about it. I know the baseball bat is at George's house. It is black with a brown handle. Later Sunday, we talked about how everyone did what. Mike said he was sorry that there wasn't any money. We said that we would say nothing to no one. Mike said if we got caught he would take the blame.

Oliver filed a motion to suppress both statements. Following a *Denno* hearing, the trial court suppressed the first statement, but held the second statement was admissible. Prior to trial, the trial court ruled that the State was prohibited from seeking the death penalty under *Thompson* v. *Oklahoma*, 487 U.S. 815 (1988), as Oliver was less than sixteen years of age at the time of the commission of the offense.[1] At trial, Oliver was found guilty of two counts of capital murder and sentenced to life without parole. While Oliver filed a motion for new trial, neither the abstract nor the record reflects whether the trial court ruled on the motion. Oliver filed a timely notice of appeal.

### I. Admission of confession

Oliver asserts that the trial court erred in refusing to hear the testimony of his expert, Dr. Douglas Stephens, at a proposed re-opened *Denno* hearing. The original *Denno* hearing was held on May 17, 1993. After hearing testimony of all the witnesses, the trial court denied the motion to suppress. However, at the request of Oliver's counsel, the trial court agreed to reopen the hearing to permit Oliver to present the testimony of Dr. Stephens, who was absent from the scheduled hearing. One month after the original hearing, Oliver's counsel sent a letter to the trial court, in which she enclosed Dr. Stephens's report.

On the first day of trial, June 21, 1993, during the prosecutor's opening statement, Oliver's counsel realized that the trial court had not yet reopened the suppression hearing, and approached the bench. Due to the fact that Investigator McWhirter, whom Oliver's counsel needed present for the hearing, had been released for the day, the trial court agreed to recess for the day and hold a re-opened *Denno* hearing the following morning. The trial court instructed the parties:

> I want the lawyers here by 8:30. I may be five minutes late. We are usually here by 8:35. We have had a lot of people tardy today and it delays everything, so I want y'all to put your watches on tonight and be here on time so we won't have so many delays and we won't have to look for

---

[1]We affirmed the trial court's denial to transfer Oliver's case to juvenile court in *Oliver* v. *State*, 312 Ark. 466, 851 S.W.2d 415 (1993).

you between every break. Does everybody understand that? Let's get started at 8:30 in the morning. Somebody tell Officer McWhirter to be here at 8:30 in the morning.

According to counsel for Oliver, she arrived around 8:45 a.m. the following morning. The record indicates that the trial court conducted an *in camera* hearing at 8:55 a.m. Noting that counsel had been late for every hearing the preceding day, the trial court held her in contempt, fined her $100.00, and refused to allow Oliver to reopen the *Denno* hearing to present the testimony of Dr. Stephens.

■ The trial court's refusal to reopen the hearing can be likened to a denial of a motion for continuance. Failure to exercise due diligence alone can be the basis to deny a motion for continuance. *Baumgarner* v. *State*, 316 Ark. 373, 872 S.W.2d 380 (1994). Arkansas Criminal Procedure Rule 27.3 provides for a grant of a continuance "only upon a showing of good cause"; the denial of a motion for continuance is within the sound discretion of the trial court and will not be reversed absent a showing of abuse. *Id.*

■ The State incorrectly asserts in its brief that even if the trial court's decision in disallowing Oliver to reopen the hearing constituted an abuse of discretion, any error was harmless, as the testimony of Dr. Stephens was admitted during his case-in-chief. While it is true that the jury was able to hear Dr. Stephens's testimony that Oliver had a mental age of 12, an IQ of 74, and that his abilities to premeditate and to weigh the consequences of his actions were limited, the admission of this testimony at trial would not remedy the failure to admit this testimony at the *Denno* hearing. We need not reach this issue, however, as we cannot conclude, in light of the facts before us, that the trial court committed error under the circumstances. In light of counsel for Oliver's tardiness and lack of diligence in offering Dr. Stephens as a witness, we hold that the trial court's refusal to reopen the suppression hearing during the trial did not constitute an abuse of discretion.

■ Oliver further asserts that the trial court erred in admitting his confession when he could not have knowingly, voluntarily, and intelligently waived his constitutional rights. When reviewing the voluntariness of confessions, we make an inde-

pendent determination based on the totality of the circumstances and reverse the trial court only if its decision was clearly erroneous. *Rucker* v. *State*, 320 Ark. 643, 899 S.W.2d 447 (1995). In determining whether a confession was voluntary, we consider the following factors: "age, education, and intelligence of the accused, lack of advice as to his constitutional rights, length of detention, repeated and prolonged nature of questioning, or the use of physical punishment." *Smith* v. *State*, 286 Ark. 247, 691 S.W.2d 154 (1985), *quoting Barnes* v. *State*, 281 Ark. 489, 665 S.W.2d 263 (1984).

Two factors are pertinent when considering the totality of the circumstances: (1) the statements made by the interrogating officer, and (2) the vulnerability of the defendant. *Free* v. *State*, 293 Ark. 65, 732 S.W.2d 452 (1987), *citing Davis* v. *State*, 275 Ark. 264, 630 S.W.2d 1 (1982). Oliver concedes that, with regard to the first factor, the statements made by Investigator McWhirter, little weighs in his favor, as the officer made no threats or promises to Oliver in exchange for his statement. McWhirter merely informed Oliver that the other defendants who had been arrested were making statements, and inquired as to whether Oliver wished to make a statement as well. In contrast, Oliver asserts that the second factor, his vulnerability, precluded him from making a knowing and intelligent waiver of his constitutional rights.

Oliver was fifteen years old at the time of his arrest and subsequent confession. Although youth is a factor, it alone is not a sufficient reason to exclude a confession. *Douglas* v. *State*, 286 Ark. 296, 692 S.W.2d 217 (1985). *See also Smith* v. *State, supra; Hunes* v. *State*, 274 Ark. 268, 623 S.W.2d 835 (1981); *Little* v. *State*, 261 Ark. 859, 554 S.W.2d 312 (1977). While officers contacted Oliver's mother to be present during his first statement, she was not present during his second incriminating statement. We have recognized, however, that "[a] minor is capable of making an admissible voluntary confession, there being no requirement that he have the advice of a parent, guardian, or other adult." *Douglas* v. *State, supra, citing Mosley* v. *State*, 246 Ark. 358, 438 S.W.2d 311 (1969).

Oliver also claims that his intelligence level made comprehension of his *Miranda* rights impossible. There was evidence presented at trial that, at the time of his confession, he

was in the seventh grade after having failed three grades, and had a second-grade reading level, an IQ as low as 74, and a mental age of a twelve-year-old. We have held many times that a low intelligence quotient, in and of itself, will not render a waiver of rights involuntary where the evidence shows the waiver was knowing and voluntary. *Lowe* v. *State*, 309 Ark. 463, 830 S.W.2d 864 (1992); *Hill* v. *State*, 303 Ark. 462, 798 S.W.2d 65 (1990); *Hart* v. *State*, 312 Ark. 600, 852 S.W.2d 312 (1993).

At the *Denno* hearing, Detectives Terry Threadgill and Jerry Cotton of the Hot Springs Police Department both testified that they verbally advised Oliver of his rights at the scene of his arrest. Investigator McWhirter testified that, prior to his March 26 interview of Oliver, he explained the waiver-of-rights form to him, and Oliver appeared to understand it. McWhirter and Little River County Chief Deputy Ken Sutton witnessed Oliver initial each response and sign the bottom of the form. McWhirter testified he was aware that Oliver was fifteen years old and in the seventh grade, but that Oliver told him that he could read and write. McWhirter listened as Oliver related his version of the murders, then handwrote a statement as Oliver repeated the story. McWhirter then gave the written statement to Oliver to read. At the end of the statement, Oliver had McWhirter add the following change to the end of the statement, "The razor is on the left side of the road." In contrast, the statement had earlier indicated that the razorblades and other evidence had been thrown on the right side of the highway.

While no experts testified at the *Denno* hearing, Oliver's aunt, Kimberly Hill, testified that Oliver read on a fourth- or fifth-grade level, and had failed the first, third, and fifth grades. She reviewed the written confession and concluded that it "didn't sound like Tim." Additionally, she described her nephew as capable of being influenced very easily.

■ At the conclusion of the testimony, the trial court denied the motion to suppress the March 26 statement, finding that:

> I don't think there's any doubt he was a little slow, but it's obvious from the first statement he gave that he was smart enough to know that he didn't want to be implicated in this murder. Just because he is a little slow doesn't mean

he doesn't have enough sense to understand all of his rights and what he was doing. I find that that second statement was proper in all regards and is (sic) admissible.

When reviewing the totality of the circumstances, we hold that the trial court's decision was not clearly erroneous.

## II. Fruit of unlawful arrest

■ For his second assignment of error, Oliver asserts that his confession was the fruit of Michael Friend's illegal arrest, *see Friend* v. *State*, 315 Ark. 143, 865 S.W.2d 275 (1993), and, thus, the trial court erred in admitting his statements. In response, the State asserts that Oliver lacks standing to raise Friend's illegal arrest and subsequent tainted confession. We can easily dispose of this point of appeal, as Oliver did not raise this argument in his motion to suppress. We rejected a similar argument raised by George Rhoades in a companion case. In *Rhoades* v. *State*, 319 Ark. 45, 888 S.W.2d 654 (1994), we said:

the State contends that Rhoades has no standing to raise Michael Friend's tainted statement due to a violation of Friend's Fourth Amendment rights. We will not address the argument of an arrest tainted by Friend's statement, however, because the argument of an arrest tainted by Friend's statement was not made to the trial court as part of Rhoades's motions to suppress. The two motions filed sought to suppress Rhoades's statements on the basis that it resulted from an arrest without "probable cause" and due to *Miranda* deficiencies. No mention of a tainted statement from Michael Friend is made and no argument to that effect exists in the record. It is well established that we will not address issues raised for the first time on appeal.

319 Ark. at 49-50, 888 S.W.2d at 657. (Citations omitted.)

In Oliver's motion to suppress, he asserted that (1) his interrogation on March 25, 1992, followed *his* illegal arrest without probable cause; (2) officers did not read him his *Miranda* rights; (3) he did not knowingly, intelligently or voluntarily waive his constitutional rights; (4) he was denied his Sixth Amendment right to counsel; and (5) any statement taken during custodial interrogation was the result of coercion, physical intimidation, and/or unauthorized promises of leniency by police. As was the

case in *Rhoades*, Oliver made no mention of a tainted statement from Michael Friend in his motion to suppress, and no argument to that effect exists in the record. Thus, we cannot address Oliver's second argument on appeal.

### III. New trial — improper contact between trial judge and jurors

For his final point on appeal, Oliver asserts that jury misconduct, of which his attorney was unaware until after the jury had returned its verdict, prejudiced his chances for a fair trial. Following his judgment and commitment on June 28, 1993, Oliver filed a motion for new trial on July 23, 1993. Attached to this motion were the affidavits of Sherrel Hibbs and Kimberly Hill, each of whom had testified on Oliver's behalf at trial. According to Hibbs, during a trial lunch break on June 24, 1993, she was seated at a restaurant with Oliver's aunt, Kim Hill, and his mother and step-father, Linda and Jack Echols, when she overheard a conversation between the trial judge, Honorable Ted Capeheart, his court reporter, Pat Motes, and a *Texarkana Gazette* reporter. According to Hibbs, the trial judge stated to the court reporter and the newspaper reporter, "I fined her," to which the court reporter replied, "But she was late, judge." The trial judge then mentioned something about a photograph of Charlene Friend with her throat cut. Seated at an adjacent table were two jurors and an unidentified woman. Also seated at a table to the left of the trial judge's table were three other jurors and an unidentified person. One of the jurors responded to the trial judge's comment about the photograph, stating, "But it's circumstantial, judge." At this point, according to Hibbs, everyone in the whole area began laughing. She and Oliver's family then left the restaurant. Hill's affidavit related similar information.

The record reflects the trial judge, by letter dated August 9, 1993, set the motion for hearing on September 13, 1993. Also included in the record are subpoenas issued by the circuit clerk's office on September 8 and 10, for the following witnesses to appear for the September 13 hearing: Carolyn Smith, juror James Best, court reporter Pat Waldrop, affiant Sherrel Hibbs, affiant Kimberly Hill, and James Bischof of the *Texarkana Gazette*. The record also contains an order from the trial judge commanding the Sevier County Sheriff's Office to pick up Oliver from the Department of Correction for the purpose of the September 13

hearing. On September 10, 1993, Oliver filed amended and second amended motions for new trial. The record does not indicate whether the September 13 hearing was ever held. Oliver filed a timely notice of appeal on September 15, 1993, as the amended motions "related back" to the date of filing the original motion. *See Williams* v. *Hudson*, 320 Ark. 635, 898 S.W.2d 465 (1995).

■■ Oliver asserts, as he did in his new trial motion, that his case falls under an exception to the general rule that errors raised for the first time on appeal will not be considered. In support of his argument, he cites *Hughes* v. *State*, 295 Ark. 121, 746 S.W.2d 557 (1988). As reviewed in *Hughes*, the very narrow exceptions to this court's general rule that it will not consider errors raised for the first time on appeal were set out in *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980). They are: (1) death-penalty cases where prejudice is conclusively shown by the record and the court would unquestionably require the trial court to grant relief under Ark. R. Crim. P. 37; (2) where error is made by the trial judge without knowledge of defense counsel; (3) where the trial court should intervene on its own motion to correct a serious error; and (4) where evidentiary errors affect a defendant's substantial rights although they were not brought to the court's attention. Oliver maintains the second exception applies in this instance. Additionally, we require that a claim of jury misconduct raised for the first time in a motion for new trial be accompanied by an affirmative showing that the defense was unaware of the misconduct until after the trial. *See Hendrix* v. *State*, 298 Ark. 568, 768 S.W.2d 546 (1989). While Oliver's attorney submitted an affidavit with the motion for new trial, the affidavit related to the issue of whether the trial court erred in refusing to reopen the *Denno* hearing. She did not state in the affidavit when she first learned of the alleged improper conduct of the trial judge and certain jurors. However, in the motion for new trial, Oliver does assert that his attorney was unaware of the misconduct until after the jury had returned its verdict, and thus had no opportunity to file an objection with the trial court.

■■ Suffice it to say, it would have been highly improper for the trial judge and jurors to have engaged in such discussions. However, mere allegations contained within pleadings are not evidence from which we can determine whether error

occurred. *Munnerlyn* v. *State*, 292 Ark. 467, 730 S.W.2d 895 (1987). While Oliver asserts in his brief that no hearing was ever held, we cannot determine from the record before us whether the scheduled hearing took place or not. If the hearing did not take place, then why not? These significant questions have no answers in the record. As the moving party, it was Oliver's burden to obtain a ruling on his motion for new trial. *See Aaron* v. *State*, 319 Ark. 320, 891 S.W.2d 364 (1995). He did not. Under these circumstances, we cannot reach the merits of Oliver's argument.

### *IV. Compliance with Ark. Sup. Ct. R. 4-3(h)*

As Oliver received a sentence of life imprisonment without parole, we must examine all objections decided adversely to him. *See* Ark. Sup. Ct. R. 4-3(h). Prior to trial, Oliver filed a motion for change of venue. The trial court denied the motion.

A change of venue should be granted only where it is clearly shown that a fair trial is not likely to be had in the county. *McArthur* v. *State*, 309 Ark. 196, 830 S.W.2d 842 (1992), *citing Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988). We will not reverse a trial court's decision denying a change of venue unless an abuse of discretion is shown. *Id.* Oliver did not file accompanying affidavits from county residents stating that he could not receive a fair trial. It was Oliver's burden to prove that a change of venue was necessary, and he failed to meet that burden. Moreover, Oliver did not exhaust all twelve of his peremptory challenges prior to the seating of the jury and therefore has not demonstrated prejudice. *Meny* v. *State*, 314 Ark. 158, 861 S.W.2d 303 (1993). Thus, we cannot say that the trial court abused its discretion in denying the motion.

We have examined the record and find that there are no erroneous rulings adverse to Oliver that cause reversal.

Affirmed.

GLAZE, J., concurs as to Point 1. Even assuming the trial court erred in refusing to reopen the *Denno* hearing to permit Dr. Stephens' testimony, that error became harmless when Dr. Stephens was permitted to testify at trial and his testimony merely reflected that it was a jury question as to whether appellant had the ability to premeditate and weigh the consequences of his actions.

BROWN, J., concurs in part, dissents in part.

DUDLEY, J., dissents as to Point 1.

CORBIN, J., dissents.

ROBERT L. BROWN, Justice, concurring in part, dissenting in part. I have two concerns about what transpired in the trial of this matter. First, as part of the contempt sanction against defense counsel for being 15 minutes late to court, the circuit judge refused to allow the defendant to present the last witness which would have completed the testimony for the *Denno* hearing. Contempt sanctions for attorney misconduct should be directed against the offending attorney, not the client. In this case, Oliver was punished by the exclusion of evidence, and that was error. The issue is whether the error was rendered harmless by the trial testimony of the previously excluded witness in light of the jury's ability to determine the reliability of the confession at trial. *See Jackson* v. *Denno*, 378 U.S. 368 (1964). I believe that it was and for that reason, I concur with the majority on this point. *See Crane* v. *Kentucky*, 476 U.S. 683 (1986).

Secondly, an *ex parte* communication was alleged between the circuit judge and jurors at a local restaurant during the course of the trial. Affidavits substantiating the event were attached to a new trial motion. The motion itself asserted that defense counsel did not learn about the communication until after the trial. The motion for new trial was filed on July 23, 1993. The circuit judge set the matter for hearing to be held on September 13, 1993, and subpoenas were issued for witnesses. Nevertheless, under our rules the motion was deemed denied on August 23, 1993, and from the record it appears that no hearing was held.

The seriousness of the matter requires resolution. Otherwise, a cloud remains over these proceedings. The majority concludes that defense counsel should have obtained a ruling. What appears to have happened, however, is that the circuit judge set the hearing too late, and the motion was deemed denied after 30 days. There is nothing to suggest that this was done intentionally by the circuit judge; indeed, it appears that the judge was proceeding towards a hearing in good faith. But under these unique circumstances where an improper communication between judge and juror is the basis for the new trial motion and it is supported

by affidavit, and where the judge must accept part of the responsibility for not deciding the motion within 30 days, I would remand the case for a hearing on the motion.

DONALD L. CORBIN, Justice, dissenting. Reluctantly, I must dissent to that portion of the majority's opinion disposing of appellant's assigned error of improper conduct between trial judge and jurors.

Appellant appears to have timely filed his motion for new trial and a hearing on the matter was set by the trial judge. No record was made of this hearing that was set for September 13, 1993, nor was any explanation for the lack thereof advanced by the state or appellant, except appellant's allegation without explanation that the hearing was never held.

The majority asks the question, "If the hearing did not take place, then why not?" The majority then goes on to assert: "These significant questions have no answers in the record. As the moving party, it was Oliver's burden to obtain a ruling on his motion for new trial. . . . Under these circumstances, we cannot reach the merits of Oliver's argument." This ruling contravenes our Arkansas Rules of Appellate Procedure because Rule 4(c) provides that "if the trial court *neither grants nor denies* the motion" for new trial within thirty days of its filing, it is deemed denied. (Emphasis added.) Subsection (f) of ARCP Rule 59 provides that a motion for new trial is not necessary to preserve for appeal an error which could be the basis for granting a new trial. If there was no hearing then there was no means available for trial counsel to make his record. Appellant was faced with an impossibility of performance. Moreover, appellant was lulled into a false sense of security because, although the trial court "did not grant nor deny" the motion within thirty days, the trial court did act on the motion within the thirty days by setting it for a hearing.

I would remand this one issue to the trial court to conduct the hearing previously set for the 13th day of September 1993. At the very minimum, I would send it back to have a hearing so the parties may present evidence that may explain the failure to conduct the September 13, 1993 hearing.