Marko Donnell HUMPHREY *v.* STATE of Arkansas

CR 96-904                                        940 S.W.2d 860

Supreme Court of Arkansas
Opinion delivered March 24, 1997

*Arkansas Public Defender Commission Capital, Conflicts and Appeals Office*, by: *Richard Lewallen* and *Teri Chambers*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant was convicted of first-degree murder and second-degree battery. On appeal, he challenges the trial court's rulings on his motion to suppress and motion to transfer to juvenile court. We find no error and affirm.

On March 6, 1994, Officers Bobby Bozarth and Willie Dinwiddie of the Augusta Police Department were on duty parked at a pharmacy located in Augusta. Around 3:35 a.m., they heard gunshots. Bozarth and Dinwiddie individually proceeded to the general area where they thought the shots came from.

While driving, Dinwiddie saw a young man, Frank Galloway, running behind a church. Galloway approached Dinwiddie and took him to the crime scene, which was about three-and-a-half blocks away from where the officers were originally parked. At the scene, two bodies were lying face down on the driveway of a residence. One girl, Shinika Ford, had been shot twice in the back and was dead. She was thirteen years old. The other girl was fifteen-year-old Stacy Johnson. Johnson had been shot once in the leg and was conscious. Both Galloway and Johnson told Dinwiddie that Marko Humphrey, fifteen years old, was the perpetrator.

Bozarth arrived on the scene immediately after Dinwiddie. They secured the crime scene, and called the Sheriff's office. Woodruff County Sheriff Jack Caperton arrived on the scene shortly thereafter. They discussed how to proceed. Dinwiddie knew that Humphrey lived with his grandmother and guardian,

Earsie Lee Richardson. Her house was only a few blocks away from the scene. Caperton decided that they needed to pick up Humphrey because, as far as they knew, he was still armed and dangerous.

By the time the officers arrived at the house, less than an hour had passed from when they initially heard the gunshots. They knocked on the door and told Richardson that they were there to talk to Humphrey. Though disputed, Caperton said that Richardson let them in the house. Humphrey was arrested and taken to the county jail; Richardson also went along.

At the booking room, Caperton testified that he read Humphrey his *Miranda* rights, and that Humphrey executed a "Statement of Rights" form. Humphrey initially told Caperton, Dinwiddie and Bozarth that Earl Lockhart shot the girls. He said that Lockhart threw the gun down on the street, and then he picked it up and threw the gun in a nearby culvert. Caperton and Dinwiddie left to investigate the area where Humphrey said the gun was. About thirty inches inside a culvert, the officers found a Llama 9mm pistol.

When Caperton returned to the jail, Humphrey was interviewed by Sergeant Henry Lamar of the Arkansas State Police Crime Investigation Division. Subsequently, Humphrey told Lamar that he wished to give another statement. Humphrey then gave a videotaped confession. He explained that he and a number of other people were at Archie Neville's house. While there, he got into an argument with Stacy Johnson. Apparently, someone had thrown water on Johnson, and she accused Humphrey of doing it. He said that Stacy Johnson threatened to have him killed the following week, and that previously Johnson had pulled a .22 gun on him in Newport. Humphrey also said that Johnson's friend, Shinika Ford, had once before tried to have him beat up in Newport. Johnson subsequently left the house with her boyfriend, Frank Galloway, and Shinika Ford. Humphrey followed after them, along with a number of other boys. Once he caught up to them, he shot Johnson and Ford using a gun he had obtained from Earl Lockhart. Afterwards, he placed the gun in the culvert and went back home to his grandmother's house. This

concluded the substance of the statement, and it was his only custodial statement admitted into evidence at trial.

The investigation revealed that Ford had been shot twice in the back, and that Johnson had been shot once in her leg. Additionally, the following ammunition was found: three live rounds of 9mm ammunition near the victims; one round in the chamber of the recovered gun; one additional round in the gun's clip; two spent shell casings at the scene; and one bullet lodged in the wall of the carport adjacent to the driveway where the victims were found. Ballistics tests on the bullet revealed that it was fired from the gun that was recovered from the culvert.

Humphrey was charged with capital murder and first-degree battery. At trial, Humphrey testified that he intentionally shot Johnson in the leg because he was angry with her, but that he had no intention of killing her. He testified that after he shot Johnson, Frank Galloway hit him and attempted to grab his hand. In the ensuing struggle, the gun discharged, accidentally shooting Ford. Humphrey then said that both he and Galloway let go of the gun, after which he picked up the gun and threw it in the culvert.

Humphrey also explained that only part of his videotaped statement was true. He testified that while the portion describing the shooting of Johnson was accurate, he had no intention of shooting Ford and had never argued with her. He testified that he confessed to shooting Ford because he felt pressured to do what the police "wanted him to do."

The jury convicted Humphrey of first-degree murder and second-degree battery. He was sentenced to life imprisonment and six years' imprisonment, respectively, along with a $10,000 fine. On appeal, Humphrey argues that the trial court erroneously ruled on his motion to suppress and on his motion to transfer to juvenile court.

## I. Motion to Suppress

Humphrey's first point on appeal is that the trial court erred in denying his motion to suppress statements. Specifically, he asserts two separate grounds in support of this argument: (A) that

his statements were not the result of a knowing, voluntary and intelligent waiver of his *Miranda* rights; and (B) that his statements were the result of an illegal arrest.

   *A.    Whether Humphrey's statements were the result of a knowing, voluntary and intelligent waiver of his* Miranda *rights.*

   ■   As stated in *Mauppin v. State*, 309 Ark. 235, 831 S.W.2d 104 (1992), the inquiry into waiver has two distinct dimensions. The first is whether the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* (citing *Colorado v. Spring*, 479 U.S. 564 (1987) and *Moran v. Burbine*, 475 U.S. 412 (1986)). Under the second inquiry, we ask whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

   ■ ■   A custodial statement is presumptively involuntary, and it is the State's burden to prove by a preponderance of the evidence that a custodial statement was given voluntarily, and was knowingly and intelligently made. *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996); *Kennedy v. State*, 325 Ark. 3, 923 S.W.2d 274 (1996). When reviewing the voluntariness of confessions, we make an independent determination based on the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Kennedy v. State, supra.* In determining whether a confession was voluntary, we consider the following factors: age, education, and intelligence of the accused, lack of advice to his constitutional rights, length of detention, repeated and prolonged nature of questioning, or the use of physical punishment. *Kennedy v. State, supra.*

   ■   Humphrey challenges the voluntariness of his confession on the ground that his age and experience rendered him vulnerable. This court has specified that statements made by the interrogating officer and the vulnerability of the accused are pertinent factors in considering the totality of the circumstances. *Oliver v. State*, 322 Ark. 8, 907 S.W.2d 706 (1995). At the time of his statement, Humphrey was fifteen years old. IQ tests revealed

that Humphrey was in the average range of intellectual functioning. At any rate, while age and mental capacity are factors that we consider, these factors standing alone are not sufficient to suppress a confession. *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996), *cert. denied*, 117 S. Ct. 246 (1996); *Oliver v. State, supra.*

Caperton testified that no promises or threats were made against Humphrey. Likewise, Lamar was not aware of any promises or threats made against Humphrey. However, he did admit to telling Humphrey that he had shot and killed someone, and that he could receive the death penalty.

Lamar said that after he took Humphrey's first statement, he sent Humphrey back to the jail's drunk tank. A few hours later, someone told Lamar that Humphrey was willing to talk to him again. Lamar testified that he then went back to Humphrey's jail cell and reminded him of the rights read to him by Caperton. He asked Humphrey if he was nonetheless willing to talk, to which Humphrey responded affirmatively. Lamar then set up the video-taped interview in the Sheriff's office.

Humphrey testified to the generally poor conditions of the drunk tank where he was kept after he was initially arrested. He said it was cold and that he was not offered anything to eat or drink. He said that Lamar appealed to him "black man to black man," and that he was trying to help him. He further stated that Lamar came to him while he was in the drunk tank, gave him a sheet of paper, and told him to write out what happened. Humphrey testified that when Lamar read what he wrote, he said "I know you're lying," and that he could get life without parole or death. He also testified that Lamar warned him of getting raped while in the penitentiary. When Humphrey further refused to talk, Lamar allegedly told him "get the fuck out of my face" and "don't say anything to me until you get ready to tell me you done it." According to Humphrey, the main reason he gave the video-taped statement was because he thought Lamar would help him.

■ A confession obtained through a false promise of reward or leniency is invalid. *See Key v. State, supra; Misskelley v. State, supra.* However, the only evidence that Humphrey's custo-dial statement was obtained through a false promise of reward

comes from his own testimony. Therefore, this is a credibility issue that is best resolved by the trial court. *See Key v. State, supra; Misskelley v. State, supra; Stone v. State*, 290 Ark. 204, 718 S.W.2d 102 (1986). We cannot say that the trial court was clearly erroneous in determining that Humphrey's statement was voluntary.

Humphrey also argues that he did not make a knowing waiver, highlighting that the rights form which he executed contained no express waiver provision. While he said that the form was executed after he told the officers where the gun was, he admitted that the rights form was read to him and that he placed his initials by each "yes" written by Caperton. Although disputed by Humphrey, Caperton testified that Humphrey indicated that he understood all of his rights that were read to him.

The evidence demonstrated that the rights form was executed about fifteen minutes after Humphrey was brought to the county jail, and that the videotaped confession was not given until approximately five hours later. Caperton testified that he read the rights form to Humphrey to see if he understood each statement, wrote "yes" on each line acknowledging the individual rights, and had Humphrey initial each acknowledgment. Humphrey also signed his name at the end of the form, as did his grandmother. The rights form contained the enumerated *Miranda* rights but no express waiver, instead providing:

> However, you may waive the right of advice of counsel and your right to remain silent, and you may answer questions or make a statement without consulting a lawyer if you so desire.

The use of a rights form that contains no express waiver provision to prove that an accused has waived his rights has not escaped strong criticism from this court. *See, e.g., Leshe v. State*, 304 Ark. 442, 803 S.W.2d 522 (1991); *Fleming v. State*, 284 Ark. 307, 681 S.W.2d 390 (1984). Humphrey correctly points out that the officers attempted to use a different form containing an express waiver later the same day. Nonetheless, a form with an express waiver provision is not a prerequisite to a finding of a knowing and intelligent waiver. *See Fleming v. State, supra.* Rather, the rights form used is simply part of the totality of the circumstances in making the determination. *See Fleming v. State,*

*supra.* Under these circumstances, we also conclude that Humphrey's waiver was knowingly and intelligently made.

### B. *Whether Humphrey's statements were the result of an illegal arrest.*

For this point, Humphrey argues that the trial court erred in denying his motion to suppress because of his warrantless arrest while in his home. He relies on *Payton v. New York*, 445 U.S. 573 (1980), where the United States Supreme Court held that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. Consistent with this principle, this court has held that all warrantless and nonconsensual entries into the home are prohibited by the Fourth Amendment, unless at the time of entry there exists probable cause and exigent circumstances. *Butler v. State*, 309 Ark. 211, 829 S.W.2d 412 (1992), *cert. denied*, 506 U.S. 998 (1992); *Mitchell v. State*, 294 Ark. 264, 742 S.W.2d 895 (1988).

### 1. *Probable cause to arrest.*

Humphrey initially challenges the existence of probable cause to arrest him. A police officer may arrest a person without a warrant if the officer has reasonable cause to believe that the person committed a felony. Ark. R. Crim. P. 4.1(a)(i). Probable cause exists where there is a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious person to believe that a crime has been committed by the person suspected. *Ross v. State*, 300 Ark. 369, 779 S.W.2d 161 (1989). The degree of proof sufficient to sustain a conviction is not required for probable cause to arrest. *Id.* All presumptions are favorable to the trial court's ruling on the legality of the arrest, and the burden of demonstrating error rests on the appellant. *Id.*

Based on the totality of the circumstances, the officers had reasonable cause to arrest Humphrey for committing a felony. Officers Dinwiddie and Bozarth both heard gunshots, and arrived at the crime scene only minutes after the shots. Frank Galloway immediately told Dinwiddie that Marko Humphrey committed

the shooting. Dinwiddie asked Johnson who had shot her, and she told him that Humphrey did it. Dinwiddie knew who Humphrey was, and where he lived (and that the house was nearby).

Humphrey argues that the witness and victim identification of Humphrey was not reliable, highlighting Caperton's own testimony that he had found Galloway to be unreliable in a prior, unrelated investigation. However, this is not a "typical" probable cause case where an *informant* has provided information to police officers. Rather, one of the surviving *victims* specifically identified Humphrey as the perpetrator. This identification was corroborated by another eyewitness. Where information is provided by a victim or witness to a crime, concerns about veracity or basis of knowledge are not as great. *See generally*, Wayne R. LaFave & Jeorld H. Israel, *Criminal Procedure* § 3.3(d) (1984 and supp. 1991) (distinguishing "informant" probable cause cases from "victim-witness" type probable cause cases). Here, both the victim and an eyewitness described the perpetrator in great detail — identifying him by name — only minutes after the shootings. Only a short amount of time elapsed between the time of the crime and the arrest, and Humphrey could have easily walked or run the few blocks between the crime scene and his grandmother's house. Under these circumstances, we conclude that the officers had probable cause to arrest Humphrey.

## 2. Consent to entry.

Next, we turn to Humphrey's contention that the officers' entry into his grandmother's house was nonconsensual. If the officers did not have valid consent, then there must have been exigent circumstances justifying the entry. *Payton v. New York, supra*. We have stated that consent to a warrantless search of one's home must be given freely and voluntarily. *Guzman v. State*, 283 Ark. 112, 672 S.W.2d 656 (1984). The State has a heavy burden to prove by clear and positive testimony that consent was freely and voluntarily given. *Id*. On appeal, we make an independent determination based on the totality of the circumstances to determine if the State has met its burden. *Id*.

At the suppression hearing, Dinwiddie testified that he went to Richardson's residence with Bozarth and Caperton. When they arrived, Dinwiddie knocked on the door and Richardson answered. He testified that he told her they needed to talk with Marko. When asked "what was [Richardson's] response?" Dinwiddie answered:

> She said okay, that he was in bed asleep and she went in, we all went in, and she woke him up and she wanted to know what was the problem and we told her what we had heard and we needed to take him down to the office and talk with him.

Caperton corroborated this version of events:

> We knocked at the door and his grandmother came to the door. I believe Officer Dinwiddie was the one that said that we wanted to know if Marko was at home and told her that there had been a shooting and that we needed to talk to him. She let us in the house and took us to Marko's room where he was laying in the bed and we got him up and got him dressed and carried him to the county jail.

Additionally, Bozarth testified to this sequence of events:

> We approached the door, knocked, and Marko's grandmother answered the door and we asked her if Marko was at home and she said yes, he was. He'd been there for a little while. We asked if we could speak with him and she wanted to know what the problem was and we advised her that we had suspected Marko had been involved in a shooting incident and we needed to talk with him. So she let us in the house and she walked to the bedroom where Marko was asleep so we woke Marko up and at that time we took Marko into custody.

Bozarth admitted that they did not inform Richardson that they did not have an arrest warrant for Humphrey, or that she did not have to let them in.

Richardson testified that the officers knocked on the door and that she answered. They then announced that they were looking for Marko. Richardson further testified to the following:

> Q: Was there any more conversation before they entered the house?
> A: No.

Q:  Did you invite them in?
A:  Well, I just opened the door and they just come in.
Q:  You didn't say 'Come on in'?
A:  No, I just opened the door.
Q:  Did you believe at that time that you were free to tell them
    — to refuse them entry?
A:  I didn't know.
Q:  Did any of them tell you they didn't have a warrant?
A:  If they had one I didn't see it.
Q:  Did any of them tell you that you were free not to let them
    in if you didn't want to?
A:  No.

She further testified that she went into Humphrey's room before Officer Dinwiddie in order to get Humphrey.

■■■ The officers' testimony constitutes clear and positive evidence that Richardson voluntarily let them in her house after they informed her that they were there to talk to Humphrey. The State correctly notes that an officer is not required to inform a person that consent may be withdrawn; the failure to so advise an individual does not invalidate consent. *See Grant v. State*, 267 Ark. 50, 589 S.W.2d 11 (1979). At most, Richardson's arguably conflicting testimony simply required a credibility determination by the trial court. In such cases, we defer to the trial court's superior position to evaluate the credibility of witnesses. *See Hamm v. State*, 296 Ark. 385, 757 S.W.2d 932 (1988); *Jones v. State*, 11 Ark. App. 129, 668 S.W.2d 30 (1984). Therefore, we cannot say that the trial court was clearly erroneous in determining Richardson consented to the officers' entry into her home.

### 3.   Exigent circumstances.

However, even if Richardson had not consented to the entry into her home, there were still exigent circumstances justifying the officers' warrantless entry.

■■■ Exigent circumstances are those requiring immediate aid or action, and, while there is no definite list of what constitutes exigent circumstances, several established examples include the risk of removal or destruction of evidence, danger to the lives of police officers or others, and the hot pursuit of a suspect. *Butler v.*

*State*, 309 Ark. 211, 829 S.W.2d 412 (1992). The facts of the present case are not unlike those presented in *Gaylor v. State*, 284 Ark. 215, 681 S.W.2d 348 (1984). There, an armed robbery was committed in a restaurant at about 10:00 p.m. The investigating officers determined that the robbery must have been committed by a former employee. The appellant, a former employee of the restaurant, fit the description of the robber and was known to be in need of money. The officers then went directly to the appellant's residence at 10:27 p.m., and knocked on the door and announced themselves over a loudspeaker. After receiving no response, the officers entered the residence through an unlocked door and arrested the appellant, in addition to seizing incriminating evidence.

On appeal, the appellant argued that, based on *Payton v. New York, supra*, the officers lacked reasonable cause to arrest and exigent circumstances to justify the warrantless entry. The *Gaylor* court affirmed, noting six potential exigent circumstances:

1) the commission of a grave offense;
2) belief that the suspect is armed;
3) a clear showing of probable cause;
4) strong reason to suspect that the suspect is in the premises being entered;
5) likelihood that the suspect will escape if not swiftly apprehended; and
6) danger of the destruction of evidence.

*Gaylor v. State, supra* (citing *United States v. Santana*, 427 U.S. 38 (1976) and *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970)).

In the present case, murder had been committed, clearly a most grave offense. Since the victims were shot and no murder weapon was immediately apparent at the crime scene, the officers had good reason to believe that the suspect was armed and dangerous. Additionally, Bozarth and Dinwiddie testified that they heard gunshots at about 3:35 a.m., and Caperton testified that they arrived at the residence at 4:21 a.m., less than an hour after the shootings. As discussed above, the officers had strong probable cause to believe that Humphrey was the perpetrator. Dinwiddie also knew that Humphrey lived with his grandmother, giving the

officers a strong reason to suspect that Humphrey was in the premises being entered. Under these particular facts, we conclude that sufficient exigent circumstances existed to justify a warrantless entry into the home, even if Richardson did not consent to the entry. *See Gaylor v. State, supra.* Therefore, the trial court was not clearly erroneous in denying the motion to suppress on the ground that the officers illegally arrested Humphrey.

## II. Transfer to juvenile court under Ark. Code Ann. § 9-27-318

For this point, Humphrey argues that the trial court erred in denying his motion to transfer to juvenile court, and asks this court to reconsider its interpretation of the law pertaining to juvenile transfers, particularly Ark. Code Ann. § 9-27-318 (Supp. 1995). Since *Walker v. State,* 304 Ark. 393, 803 S.W.2d 502 (1991), this court has repeatedly held that in considering motions to transfer to juvenile court, the circuit court does not have to give equal weight to the statutory factors found in Ark. Code Ann. § 9-27-318, and that it is permissible to give substantial weight to the criminal information. *See, e.g., Lammers v. State,* 324 Ark. 222, 920 S.W.2d 7 (1996); *Booker v. State,* 324 Ark. 468, 922 S.W.2d 337 (1996); *Butler v. State,* 324 Ark. 476, 922 S.W.2d 685 (1996); *Holmes v. State,* 322 Ark. 574, 911 S.W.2d 256 (1995).

Essentially, Humphrey argues that the reasoning employed in these cases is flawed. More specifically, he maintains that allowing the trial court to establish the seriousness of the offense merely by the felony information "is in direct conflict with our jurisprudence." Echoes of this argument can be found in *Sanders v. State,* 326 Ark. 415, 932 S.W.2d 315 (1996), where this court observed that:

> [U]nder our current interpretations of the code, prosecuting attorneys can file a serious charge against a juvenile in circuit court and do nothing more. It may be that there is no substantial evidence to support the charge, and a transfer may be denied.
> * * *
> This type of proceeding was not envisioned by the drafters of the juvenile code, and we did not intend for our interpretations to do away with the need for a meaningful hearing. As a result, we issue a caveat that in juvenile transfer cases tried after this date, we

will consider anew our interpretation of the juvenile code when the issues are fully developed and briefed.

While Humphrey's point is well-taken in light of *Sanders v. State*, this case does not present this court with such an opportunity to reevaluate our interpretation of the juvenile code.

▮ Here, there was clearly substantial evidence of the serious and violent nature of the crime charged, sufficient for the denial of the transfer. At the hearing on the transfer motion, Galloway testified that Humphrey pulled out a gun and shot Stacy Johnson, that he turned and attempted to shoot at him, and that he then shot Shinika Ford. Johnson also testified that she heard Humphrey say, "You won't mess with me no more," and then she was shot in the leg. She then said that Humphrey turned and shot Ford as she was "fixing to run." Given the most serious nature of the crimes charged, and the substantial evidence supporting the charges, the trial court did not err in denying the motion to transfer to juvenile court.

### III. Rule 4-3(h) Compliance

The record has been reviewed for prejudicial error pursuant to Ark. Sup. Ct. R. 4-3(h), and no reversible errors were found.

Affirmed.