Damond SANFORD *v.* STATE of Arkansas

CR 96-908 962 S.W.2d 335

Supreme Court of Arkansas
Opinion delivered February 5, 1998
[Petition for rehearing denied March 12, 1998.]

*William M. Howard, Jr.*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. A jury convicted Damond Sanford of capital murder, residential burglary, rape, and theft of property and sentenced him to death. On appeal, Sanford raises five arguments for reversal. We affirm.

On January 9, 1995, Ocie Gary received a telephone call from her close friend, Minnie Ward, around 9:30 in the morning. Ward was an eighty-five-year-old woman who lived alone in

Eudora. During their conversation, Ward told Gary that she saw a boy walking across the field behind her house and approaching her back door. Ward told Gary that she would call her back after "I see what he going to say this time." That was the last time anyone ever spoke to Minnie Ward.

Around 8:30 p.m., Ward's slain body was discovered in the hallway by her back door. She had been shot twice and raped. The glass to the outer storm door had been shattered and there were three bullet holes in the screen. The inner, wooden door was locked and there were no signs of a forced entry. The police retrieved one .38 bullet from the door frame, and two .38 bullets from Ward's body. Ward's purse was found on the floor in her kitchen which was near the back door. Ricky Tolliver later testified that his mother typically hung her purse on the bedroom doorknob, and that she did not leave it on the floor.

The next day, January 10, 1995, Earlene McQuay, the defendant's sister, found a .44 Smith and Wesson handgun hidden in a paper bag on the top shelf of her closet. Ricky Tolliver later identified the gun as belonging to the victim. Tolliver explained that Ward kept the 100-year-old gun with her at all times, and that she even slept with it under her pillow and placed it in the chair beside her while she was awake. During the trial, David Palmer testified that he saw a gun in Sanford's coat pocket around 4:00 p.m. on the day of the murder.

After finding the gun in her closet, McQuay questioned Sanford, her sixteen-year-old brother, about the murder. Sanford admitted that he killed Ward, and then he threatened to kill McQuay, her boyfriend, and her children if she told anyone about the crime. McQuay later reported this information to the police. During a subsequent search, the police discovered a live .38 round hidden behind Sanford's headboard.

The following day, January 11, 1995, Sanford agreed to take a lie detector test. After signing a *Miranda* waiver form, Sanford made the following confession which was handwritten by Officer Howell:

> Damond Sanford states that he went over to Minnie Ward's house around 10:00 or 11:00 and went in to burglarize the

house. States that he knocked on the door. She came in. He saw a gun on the dresser. States he brought a gun to the house, a .380. When he made a step into the house, he started shooting. He opened the screen door. She opened the other door. He states that as soon as he walked in he started shooting. He states that he shot approximately three times. She had a gun in her hand and that's why I started shooting. She had a purse on her dresser. He grabbed the purse and got twenty-five dollars ($25.00) out of the purse. He states that he then ran out the door. He states that he thinks he shot her in the hand. He states that he threw the gun in the pond by his house after he left her house. He then went to his friend's and they went to Greenville. I am making this statement without any threats, rewards, or promises.

Officer Howell read the statement aloud to Sanford who made a few corrections before signing it. Officer Howell then asked Sanford about the rape, and Sanford made the following statement which was added to his signed confession:

And he states that after he shot her the first time, he had sex with her. Then he killed her.

Officer Howell read the added statement to Sanford, who verified its accuracy and signed the statement a second time. Based on this evidence, the jury found Sanford guilty of theft of property, residential burglary, rape, and capital murder.

## I. Sufficiency of the Evidence

For his first argument on appeal, Sanford challenges the sufficiency of the evidence to support each of his convictions. As we have stated numerous times, the test for determining the sufficiency of the evidence is whether there is substantial evidence to support the verdict. *Burris v. State*, 330 Ark. 66, 954 S.W.2d 209 (1997); *Williams v. State*, 329 Ark. 8, 946 S.W.2d 678 (1997). Substantial evidence is direct or circumstantial evidence that is forceful enough to compel a conclusion one way or another and which goes beyond mere speculation or conjecture. *Green v. State*, 330 Ark. 458, 956 S.W.2d 849 (1997); *Burris, supra.* In making this determination, we review the evidence in the light most favorable to the State, and consider evidence both properly and improperly admitted. *Green, supra; Burris, supra.*

## A. Theft of Property

First, Sanford contends that there was insufficient evidence to support the theft conviction because the State failed to prove that he took any of the victim's property as required by Ark. Code Ann. § 5-36-103(a)(1) (Repl. 1997). We conclude that Sanford's contention is contrary to the evidence adduced at trial for several reasons. First, Sanford admitted that he took twenty-five dollars from the victim's purse. Moreover, the victim's son, Ricky Tolliver, identified the .44 Smith and Wesson found in McQuay's apartment as belonging to his mother. Tolliver also explained that his mother did not usually keep her purse on the floor near the back door. Finally, David Palmer saw a gun in Sanford's coat pocket on the day of the murder. Because there was sufficient evidence that Sanford took money and a weapon from Ward's home, we affirm Sanford's theft conviction.

## B. Residential Burglary

Sanford next claims that we must reverse his conviction of residential burglary because the State failed to prove that he entered Ward's home with the purpose of committing an offense punishable by imprisonment as required by Ark. Code Ann. § 5-39-201(a)(1) (Repl. 1997). The most persuasive evidence of Sanford's intention was his statement to the police that "he went over to Minnie Ward's around 10:00 or 11:00 and went in to burglarize the house." Moreover, Sanford told Officer Howell that he broke into Ward's home so that he could steal money to buy a Rottweiler. Accordingly, we affirm Sanford's conviction of residential burglary because there was sufficient evidence that he entered Ward's home for the purpose of taking her property.

## C. Rape

Third, Sanford argues that his rape conviction must be reversed because the State failed to prove that Ward was alive when she was sexually assaulted. We have never specifically determined whether the victim must be alive in order for a sexual assault to constitute rape under Ark. Code Ann. § 5-14-103 (Repl. 1997). See Roderick v. State, 288 Ark. 360, 705 S.W.2d 433 (1986). This determination, however, is not necessary because

there was sufficient evidence that Ward was alive at the time she was sexually assaulted.

First and foremost, Sanford admitted to the police that: "he shot her the first time, he had sex with her. Then he killed her." This evidence was corroborated by the following statements contained in the autopsy report which was admitted into evidence without objection pursuant to Ark. Code Ann. § 12-12-313 (Repl. 1995):

> The direction of travel [of the first bullet] was front to back, downward, and left to right.
>
> . . . .
>
> The direction of travel [of the second bullet] was left to right, front to back, and upward.

From this description of Ward's injuries, the jury could have inferred that the two shots were fired at different times and from substantially different angles. Hence, the jury could have reasonably assumed that Ward was shot the first time while she was standing upright, raped, and then shot the second time while she was lying on the floor. Finally, the coroner estimated that Ward died between 11:00 a.m. and 1:30 p.m which is several hours after Ward ended her telephone conversation with Gary to greet the visitor approaching her back door. Because there was sufficient evidence that Ward was alive at the time of the sexual assault, we affirm Sanford's rape conviction.

### D. Capital Murder

Finally, Sanford was convicted of capital murder under Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1997), which states in relevant part that a person is guilty of capital murder if he or she:

> Acting alone or with one (1) or more other persons, . . . commits or attempts to commit rape, . . . burglary, . . . or escape in the first degree, and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life.

On appeal, Sanford raises two challenges to this conviction. First, Sanford argues that we must reverse because the State failed

to prove the underlying felony of either rape or burglary. As previously discussed, we conclude that there is sufficient evidence to support both of those convictions.

■ ■ Next, Sanford contends that the State failed to prove that he killed Ward "under circumstances manifesting extreme indifference to the value of human life" as required by the statute. We have previously defined "extreme indifference" as deliberate conduct that culminates in the death of another person. *McGehee v. State*, 328 Ark. 404, 943 S.W.2d 585 (1997); *Davis v. State*, 325 Ark. 96, 925 S.W.2d 768 (1996). Moreover, we have clarified that intent may be inferred from the type of weapon used; the manner of use; and the nature, extent, and location of the trauma suffered by the victim. *Hill v. State*, 325 Ark. 419, 931 S.W.2d 64 (1996).

■ In this case, there was evidence that the victim was shot twice in the upper abdomen by a .38 handgun. Sanford told the police that he shot three times as soon as he stepped into Ward's home. Finally, Sanford told his sister, Earlene McQuay, that he killed Ward. Because there was sufficient evidence that Sanford acted with extreme indifference to the value of Ward's life, we affirm his conviction of capital murder.

### E. Credibility

■ ■ In addition to his specific challenges to each offense, Sanford contends that the State failed to prove its case because he testified at trial that Mingo Kennedy shot Ward, stole her property, and then forced him to have sex with the victim. We, however, have previously held that it is the sole province of the jury to determine the credibility of the witnesses, and that they may choose to believe the State's version of the facts over the defendant's. *Mulkey v. State*, 330 Ark. 113, 952 S.W.2d 149 (1997); *Hicks v. State*, 327 Ark. 652, 941 S.W.2d 387 (1997); *Jones v. State*, 326 Ark. 61, 931 S.W.2d 83 (1996). Thus, we hold that there was sufficient evidence to support each of Sanford's convictions despite his contention that the crimes were committed by a third party.

## II. Motion to Suppress

For his second argument on appeal, Sanford claims that the trial court erred when it denied his motion to suppress his January 11, 1995 confession. Specifically, Sanford contends that: 1) his confession was involuntary because it was obtained by the use of false promises, and 2) that his youth and low IQ prevented him from making a knowing and intelligent waiver of his *Miranda* rights. These are two distinct issues requiring separate analysis. *Wofford v. State*, 330 Ark. 8, 952 S.W.2d 646 (1997); *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997).

### A. Confession

First, Sanford contends that his confession was involuntary. Hence, the issue on appeal is whether Sanford's confession was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Wofford, supra*; *Humphrey, supra*. In making this determination, we review the totality of the circumstances, and reverse the trial court only if its decision was clearly erroneous. *Davis v. State*, 330 Ark. 76, 953 S.W.2d 559 (1997); *Humphrey, supra*. In this regard, the relevant factors are the age, education, and intelligence of the accused; the lack of advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of mental or physical punishment. *Davis, supra*; *Wofford, supra*; *Humphrey, supra*.

Sanford argues that his confession was involuntary because it was obtained by false promises. Sanford is correct that a confession obtained by false promises of leniency is invalid. *Humphrey, supra*; *Misskelley v. State*, 323 Ark. 449, 915 S.W.2d 702 (1996), *cert. denied*, 117 S. Ct. 246 (1997); *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1997). During the suppression hearing, Sanford's father testified that his son told him immediately after the confession that Officer Howell told him to "fuck the system" by pretending that he was crazy, and that Officer Howell promised him that he could go home as soon as "he got it over with." In contrast, Officer Howell denied making any such statements to Sanford. When there is conflicting evidence regarding whether the police made false promises, the issue becomes one of credibility to be determined by the trial court. *Humphrey, supra*; *Misskel-*

*ley, supra; Key, supra.* In this case, the trial court concluded that Officer Howell did not make the alleged statements to Sanford, and we cannot say that the court's ruling was clearly erroneous.

In reviewing the remaining relevant factors, we acknowledge that the interview with Officer Howell was not unduly long and occurred at a reasonable time of the day. There was also no evidence that the police denied any of Sanford's requests, or that Sanford was under the influence of drugs or alcohol at the time of his statement. Moreover, at the time of the questioning Officer Howell was wearing street clothing and did not have a badge or gun. Finally, Officer Howell declared that he was gentle with Sanford and did not use any threats or coercion to obtain his statement. Based on the totality of the circumstances surrounding Sanford's confession, we cannot say that the trial court's conclusion that the statement was voluntary was clearly erroneous. Accordingly, we affirm on this point.

### B. Waiver

Next, Sanford argues that his confession must be suppressed because he did not knowingly and intelligently waive his *Miranda* rights. Here, the relevant inquiry is whether Sanford waived his rights "with the full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *State v. Bell,* 329 Ark. 422, 948 S.W.2d 557 (1997); *Humphrey, supra.* We make this determination by reviewing the totality of the circumstances surrounding the waiver which include the age, experience, education, background, and intelligence of the defendant. *Hart v. State,* 312 Ark. 600, 852 S.W.2d 312 (1993); *Mauppin v. State,* 309 Ark. 235, 831 S.W.2d 104 (1992).

First, Sanford contends that his waiver was not knowingly or intelligently made because he was only sixteen years old at the time of his statement. We, however, have previously held that defendants younger than Sanford were capable of giving a knowing and intelligent waiver. *See, e.g., Oliver v. State,* 322 Ark. 8, 907 S.W.2d 706 (1995) (fifteen year old); *Douglas v. State,* 286 Ark. 296, 692 S.W.2d 217 (1985) (fifteen year old).

Sanford also argues that his waiver was invalid due to his low IQ. During the suppression hearing, Dr. Stevens, a clinical psychologist, testified that Sanford was "mildy mentally retarded" with a "verbal IQ of 70, a non-verbal IQ of 66, and a full-scale IQ of 67." We, however, have previously held that a low IQ, standing alone, does not mean that a suspect is incapable of waiving his rights. *Misskelley, supra; Oliver, supra.* Moreover, Dr. Stevens conceded that Sanford understood "some aspects of probably every statement" on the waiver form, and Dr. Stevens was unable to quantify the amount of the form that Sanford was incapable of understanding.

Officer Howell testified that he read each statement on the waiver form to Sanford who responded "yes" and signed his full name to the waiver of each right and again at the bottom of the form. Sanford appeared to understand his rights and did not ask any questions about the form. We also find persuasive the fact that Sanford executed a similar waiver form the day before the confession, and that there was evidence that Sanford's father was present during the execution of both waiver forms. The parent's presence, although not required, has previously been found to be a significant factor. *Misskelley, supra; Oliver, supra.* Moreover, the State established that Sanford had been adjudicated a delinquent on two prior occasions. A juvenile's familiarity with the criminal justice system is also a relevant factor when determining whether the waiver of his rights was knowingly and intelligently made. *Bell, supra; Misskelley, supra.*

Based on the totality of these circumstances, we cannot say that the trial court clearly erred when it found that Sanford knowingly and intelligently waived his *Miranda* rights before he confessed to killing Ms. Ward. Accordingly, we affirm the trial court's denial of Sanford's motion to suppress his confession.

### III. Motion to Transfer to Juvenile Court

Next, Sanford appeals the trial court's denial of his motion to transfer the case to juvenile court. Before addressing the merits, we note that the State contends that this issue is procedurally barred because the denial of a motion to transfer to juvenile court must be raised in an interlocutory appeal, instead of upon direct

appeal. In *Hamilton v. State*, 320 Ark. 346, 896 S.W.2d 877 (1995), we held that:

> for criminal prosecutions commenced after the finality of this opinion (May 1, 1995), an appeal from an order granting or denying transfer of a case from one court to another having jurisdiction over juvenile matters must be considered by way of interlocutory appeal, and an appeal from such an order after a judgment of conviction in circuit court is untimely and will not be considered.

Because this case was commenced before May 1, 1995, the procedural bar annunciated in *Hamilton* does not apply.

 Turning to the merits, it is clear that a trial court's decision to try the juvenile as an adult must be supported by clear and convincing evidence, Ark. Code Ann. § 9-27-318(f) (Supp. 1997), and we will not reverse the court's determination unless it is clearly erroneous. *Thompson v. State*, 330 Ark. 746, 958 S.W.2d 1 (1997); *Fleetwood v. State*, 329 Ark. 327, 947 S.W.2d 387 (1997). A trial court's decision must be based on the following factors:

> (1) The seriousness of the offense, and whether violence was employed by the juvenile in the commission of the offense;
>
> (2) Whether the offense is part of a repetitive pattern of adjudicated offenses which would lead to the determination that the juvenile is beyond rehabilitation under existing rehabilitation programs, as evidenced by past efforts to treat and rehabilitate the juvenile and the response to such efforts; and
>
> (3) The prior history, character traits, mental maturity, and any other factor which reflects upon the juvenile's prospects for rehabilitation.

Ark. Code Ann. § 9-27-318(e) (Supp. 1997). Although the court must consider all of these factors, it is not required to give them equal weight. *Thompson, supra*; *Fleetwood, supra*.

 In this case there was evidence that Sanford was involved in a capital murder, which undoubtedly is a crime of a serious and violent nature. This alone is a sufficient reason to affirm the trial court's ruling. *Thompson, supra*; *Sims v. State*, 329 Ark. 350, 947 S.W.2d 376 (1997). Furthermore, the State estab-

lished that Sanford had previously been adjudicated a delinquent for placing tacks in the road, and for stealing and destroying a truck. Sanford was placed on probation for both offenses, and was on probation for the latter offense on the day of the murder. These additional facts support the trial court's conclusion that Sanford was beyond rehabilitation in the juvenile system. For these reasons, we affirm the trial court's denial of Sanford's motion to transfer his case to juvenile court.

## IV. Hearsay

For his fourth argument on appeal, Sanford contends that the trial court committed reversible error when it allowed two alleged hearsay statements to be admitted into evidence. We will not reverse a trial court's ruling on a hearsay question unless the appellant can demonstrate an abuse of discretion. *Goff v. State*, 329 Ark. 513, 953 S.W.2d 38 (1997); *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997).

First, Sanford challenges a portion of Ocie Gary's testimony regarding her telephone conversation with the victim on the day of the murder. Specifically, Gary testified that Ward said she saw a boy walking across a field to her house. It is well settled that an alleged hearsay statement is admissible under Ark. R. Evid. 803(1), if it is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." *Brown v. State*, 320 Ark. 201, 895 S.W.2d 909 (1995); *Davis v. State*, 317 Ark. 592, 879 S.W.2d 439 (1994). Ward's description was made contemporaneously with her observation. Accordingly, we hold that the trial court did not abuse its discretion when it allowed Gary's statement into evidence.

Next, Sanford claims that the trial court erred when it allowed Earlene McQuay to testify that her daughter told her that Sanford had a gun. The trial court held that the daughter's statement was not hearsay because it was offered to show why McQuay searched her house and not to prove the truth of the matter asserted — that Sanford had a gun. The trial court did not abuse its discretion in making this ruling because we have held on several occasions that an out-of-court statement is not hearsay

under Ark. R. Evid. 801(c) if it is offered to show the basis for the witness's action. *Bragg, supra; Martin v. State*, 316 Ark. 715, 875 S.W.2d 81 (1994); *Dandridge v. State*, 292 Ark. 40, 727 S.W.2d 851 (1987). Accordingly, we affirm the trial court's ruling on both of these evidentiary issues.

## *V.* Batson *Challenges*

For his last argument on appeal, Sanford claims that the State improperly used its peremptory challenges to exclude three African-Americans from the jury in violation of the Equal Protection Clause of the Fourteenth Amendment as construed in *Batson v. Kentucky*, 476 U.S. 79 (1986). In *Purkett v. Elem*, 514 U.S. 765 (1995) (per curiam), the United States Supreme Court held that the following three-step analysis should be applied when analyzing a *Batson* challenge. First, the party objecting to the use of the peremptory challenge must make a prima facie case of racial discrimination. *Id*. Second, the burden of production, not persuasion, shifts to the striking party to come forward with a race-neutral explanation for removing the juror. *Id*. In *Purkett*, the Court clarified that at this stage the explanation does not have to be "persuasive, or even plausible." *Id*. Instead, the relevant inquiry in step two is:

> "the facial validity of the [striking party's] explanation. Unless a discriminatory intent is inherent in the [striking party's] explanation, the reason offered will be deemed race neutral."

*Id*. (quoting *Hernandez v. New York*, 500 U.S. 352 (1991) (plurality opinion)). Finally, during the third step, the opponent of the strike bears the ultimate burden of persuading the trial judge that the race-neutral reason offered by the striking party is merely a pretext for purposeful discrimination. *Id*.

As we have previously noted, the trial court is in a superior position to make these determinations because it has the opportunity to observe the parties and determine their credibility. Accordingly, we will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *Green v. State*, 330 Ark. 458, 956 S.W.2d 849

(1997); *Roseby v. State*, 329 Ark. 554, 953 S.W.2d 32 (1997); *Sonny v. Balch Motor Co.*, 328 Ark. 321, 944 S.W.2d 87 (1997).

On appeal, Sanford argues that the trial court erred when it denied his *Batson* challenges to the State's use of peremptory strikes to exclude the following three African-Americans from the jury: Elsie Marshall, Marcus Martin, and Brenda Donald.[1] The State explained that it struck Ms. Marshall because she suffered from high blood pressure and blackouts. The State further justified its strike by explaining that it did not strike Rose Harris, who was also an African-American who suffered from heart problems, because Harris's heart condition was not aggravated by stressful situations as was Ms. Marshall's. The trial court concluded that the State's race-neutral explanation for striking Ms. Marshall was not a pretext for purposeful discrimination.

Next, the State explained that it struck Marcus Martin because he had previously been charged with a crime in Eudora. Although the case against Mr. Martin was dismissed, the State feared that he might have some animosity towards the State. The court concluded that the State's explanation was not a pretext, and we have previously affirmed cases where a party struck a juror because the juror or the juror's family members were involved in criminal cases. *See, e.g., Jackson v. State*, 330 Ark. 126, 954 S.W.2d 894 (1997).

Finally, Sanford raised a *Batson* challenge to the State's use of a peremptory challenge to strike Brenda Donald. During voir dire, Ms. Donald declared four times that she was morally opposed to the death penalty, but she ultimately conceded that she could sign a death verdict because it was the law. The State later used a peremptory challenge to strike Ms. Donald because "she was the only one of the twelve that said she does not believe in the death penalty." In *Green, supra*, we held that the State could use a peremptory challenge to strike a juror who was morally opposed to

---

[1] The parties and the court skipped step one during which Sanford was suppose to establish a prima facie case of racial discrimination, and proceeded to steps two and three. We have previously held that this renders moot the issue of whether the first step was satisfied. *Roseby v. State*, 329 Ark. 554, 953 S.W.2d 32 (1997); *Sonny v. Balch Motor Co.*, 328 Ark. 321, 944 S.W.2d 87 (1997).

the death penalty even though the State could not strike the juror for cause because he declared that he could consider the death penalty under certain circumstances. As in *Green*, Ms. Donald's responses did not prevent her from being death qualified, but did indicate her propensity towards rendering a life sentence instead of the death penalty.

As previously mentioned, the trial court was in a superior position to observe the credibility of the jurors and the attorneys during the challenges to each juror. In this case, the court concluded that the State's race-neutral explanations for striking Elsie Marshall, Marcus Martin, and Brenda Donald were not pretexts for purposeful discrimination. We also find persuasive the fact three African-Americans were ultimately seated on the jury. Because we cannot say that the trial court's rulings were clearly against the preponderance of the evidence, we affirm the court's decision to allow the State to strike all three jurors.

### VI. Arkansas Supreme Court Rule 4-3(h)

In accordance with Supreme Court Rule 4-3(h), the record of trial has been examined for error in rulings by the trial court which were adverse to Sanford. None have been found.

Affirmed.