Chad Wesley HAMILTON  *v.*  STATE of Arkansas

CA CR 06-257                                        245 S.W.3d 710

Court of Appeals of Arkansas
Opinion delivered December 20, 2006

*Hatfield & Lassiter*, by: *Jack T. Lassiter* and *Erin Cassinelli Couch*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Karen Virginia Wallace*, Ass't Att'y Gen., for appellee.

JOSEPHINE LINKER HART, Judge. Chad Wesley Hamilton was convicted in an Arkansas County Circuit Court jury trial of second-degree murder, for which he was sentenced to twenty years in the Arkansas Department of Correction. On appeal he argues that the trial court: 1) erred in denying his motion to suppress evidence obtained through a warrantless search of his home; 2) erred in refusing his proffered jury instruction on self-defense and, instead, "inaccurately" instructed the jury; and 3) abused its discretion by denying his motion to continue the trial to allow a material defense witness to appear. We reverse and remand for a new trial.

We first consider Hamilton's argument concerning the trial court's failure to give his proffered jury instruction on self-defense. Because Hamilton's argument concerns the inadequacy of the self-defense instruction that was given at trial, not that an instruction on self-defense was warranted, we will only briefly summarize the relevant testimony.

Through multiple witnesses it was established that in the early-morning hours of May 8, 2004, Hamilton arrived uninvited at an "after prom" party attended by Stuttgart High School students and some of their college-age friends. He was intoxicated, and it was obvious to those individuals at the party that he was in an impaired state. Most of the guests at the party were consuming alcohol as well and were in various stages of inebriation. Hamilton was confronted by two of the guests who called him a "queer." Hamilton left the party grounds along with several of the guests who were anticipating a fight. Many of the guests were carrying beer bottles, and a beer bottle was thrown at Hamilton. Hamilton testified that he was afraid that "somebody was going to just bust a beer bottle in the back of my head." At least three young men squared off against Hamilton. Hamilton drew a pocket knife from his pocket, which did not dissuade his opponents from continuing to confront him. At some point, twenty-one-year-old Allen Fortune "swung" at Hamilton, and Hamilton stabbed Fortune through the heart with the pocket knife.

At the trial, Hamilton proffered two jury instructions as Defendant's Exhibit B, including AMI Criminal 2d 705 and AMI

Criminal 2d 1302 (modified) Battery in the Second Degree. The jury instruction, which contained both alternatives, read in pertinent part:

> This is a defense only if:
>
> First:    Chad Hamilton reasonably believed that Allen Fortune was committing or was about to commit second degree battery, with force or violence, or Chad Hamilton reasonably believed that Allen Fortune was about to use unlawful deadly physical force; and
>
> Second: Chad Hamilton only used such force as he reasonably believed to be necessary.

The State opposed giving both the second-degree battery and the unlawful deadly physical force alternatives, arguing that it was "an either/or proposition." Further, it asserted that the first alternative was only "intended for occasions when you have something other, like a rape or a robbery, because it says commits a 'blank' felony with force or violence." The trial court agreed with the State's argument and only instructed the jury on the "unlawful deadly physical force" alternative in AMI Criminal 2d 705.

On appeal, Hamilton argues that the trial court erred in denying his proffered jury instruction on self-defense and instead inadequately instructed the jury because it omitted the second-degree battery alternative in the version of AMI Criminal 2d 705 that he had proffered. He notes that the model instruction was based on Arkansas Code Annotated section 5-2-607 (Repl. 2006), which provides in pertinent part:

> (a) A person is justified in using deadly physical force upon another person if he reasonably believes that the other person is:
>
> (1) Committing or about to commit a felony involving force or violence;
>
> (2) Using or about to use unlawful deadly physical force;

Hamilton asserts that because there was some evidence to support the instruction that he proffered, the trial court committed reversible error by declining to give it. Further, he argues that he was prejudiced by the deficiency of the self-defense instruction because the given

instruction inappropriately limited his ability to provide a reasonable doubt in the jurors' mind. We agree.

Our case law is clear that a party is entitled to a jury instruction when it is a correct statement of law and when there is some basis in the evidence to support giving the instruction. *Jones v. State*, 336 Ark. 191, 984 S.W.2d 432 (1999). Moreover, a trial court is required to give a jury instruction if there is some evidence to support it. *Id.* In determining if the trial court erred in refusing an instruction in a criminal trial, the test is whether the omission infects the entire trial such that the resulting conviction violates due process. *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002); *Branstetter v. State*, 346 Ark. 62, 57 S.W.3d 105 (2001).

■■ There is a presumption that the model instruction is a correct statement of the law, *Porter v. State*, 358 Ark. 403, 191 S.W.3d 531 (2004), and we believe that the plain wording of subsection (a) of our justification statute is fully and faithfully reflected in AMI Criminal 2d 705. Because second-degree battery has as one of the elements the infliction of serious physical injury, we must conclude that it is a "felony involving force or violence." *See* Ark. Code Ann. § 5-13-202 (Repl. 2006). Accordingly, the trial court erred in refusing to give both relevant alternatives in the instruction. Furthermore, the prejudice to Hamilton's case is patent; it is a much more daunting task under these facts to convince a jury that he was confronted with unlawful deadly physical force than to prove that the individuals who were arrayed against him were likely to cause serious physical injury. Accordingly, we reverse and remand this case for a new trial.

Because we are ordering a new trial, and the warrantless entry into Hamilton's residence yielded both incriminating statements and the alleged murder weapon, we next consider Hamilton's argument concerning the trial court's denial of his motion to suppress because this issue will arise again on retrial. At the hearing on Hamilton's motion, only a single witness testified, Stuttgart police officer Ryan Minney. Minney stated that he was acquainted with Hamilton from at least three contacts with him prior to the May 7, 2004 incident that gave rise to his murder conviction and this appeal. Minney claimed that on April 25, 2004, he patted down Hamilton and discovered a black, three-to-four-inch-long knife unfolded in his pocket. Hamilton allegedly told him that he carried the knife "in case he was jumped" and that he was "prepared to do whatever he needed to do with that knife."

Minney also claimed that he saw Hamilton walking down Main Street at 1:45 a.m. on May 8, 2004. He recalled that Hamilton was wearing blue jeans and had a "silvery-gray, silk-looking short-sleeve shirt" wrapped around his head. Hamilton told him that he was walking home. Minney stated that he did not have further contact with Hamilton until after he had arrived at the scene of the homicide.

Minney testified that when he arrived at the AP&L parking lot at 2:13 a.m., the victim, Allen Fortune, was lying on the ground, and another man was holding pressure on Fortune's chest. Minney took over for that individual. Fortune was having trouble breathing and his pulse was faint. Minney stated that he heard "several of the people" standing around say that " 'Chico' or 'Chad' " was the person responsible and that the perpetrator had run south toward South Main Street. Minney knew that they meant Hamilton and knew where Hamilton lived. When the EMT arrived, he "let some of the officers know," and they went to Hamilton's residence at 1702 South Main Street.

Minney arrived at Hamilton's house at approximately 2:30 a.m., and knocked on the door. He got no response, but did see Hamilton's shirt laid over a chair in the dining area. Minney left other police officers, Mike Perry and Deputy Burgess, at the house and returned to the crime scene, where he informed one of the CID officers about what had happened. He and Officer Sandine walked the route that they assumed Hamilton had taken to search for evidence, but they found nothing. When Minney arrived back at Hamilton's residence at 4:32 a.m., he again unsuccessfully tried to make contact. He noticed through the window that the television had been turned on and that the shirt was still visible in the dining area. He returned to the crime scene and informed police lieutenants Austin and Mannis that there were signs of someone in Hamilton's residence. The other officers accompanied him back to Hamilton's residence, where they noticed that the television had been turned off. At that time they were aware that Fortune had died.

At approximately 5:30 a.m., the police decided to enter Hamilton's residence. Austin shouted "very loud" that he was a Stuttgart police officer and asked Hamilton to come to the door. He repeated it "four or five times," then Officer Perry "kicked in the door to gain entry." The police split up to secure the house. He noticed a black knife lying on the dining room table and Hamilton's shirt nearby. Minney asserted that it was the same knife

that he had discovered on Hamilton's person on April 25. He seized the knife and Hamilton's clothing. He claimed that the knife appeared to be damp, as if it had been washed. Minney asserted that he was concerned about securing the evidence before Hamilton could tamper with it. Minney proceeded to the bedroom, where he observed Hamilton being arrested. According to Minney, Hamilton asked them why they were there, and when Mannis told him that he was being arrested for homicide, Hamilton stated, "Nobody died."

The police transported Hamilton to the police station. After he was Mirandized, Hamilton called his grandfather and informed him that he had been arrested. Minney claimed that he overheard Hamilton say, "I used the knife. Nobody had to die. I did what I had to do."

In opposing Hamilton's motion to suppress, the State cited *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997), a case in which the supreme court enumerated six potential exigent circumstances: 1) the commission of a grave offense; 2) belief that the suspect is armed; 3) a clear showing of probable cause; 4) strong reason to suspect that the suspect is in the premises being entered; 5) likelihood that the suspect will escape if not swiftly apprehended; and 6) danger of the destruction of evidence. It argued that only the likelihood of Hamilton's escape was not present in the instant case, and therefore the trial court should find the warrantless entry into Hamilton's home was justified by exigent circumstances. Hamilton cited to the trial court the more recent case of *Mann v. State*, 357 Ark. 159, 161 S.W.3d 826 (2004), in which the supreme court cited with approval *United States v. Duchi*, 906 F.2d 1278 (8th Cir. 1990), a case in which the Eighth Circuit Court of Appeals recognized two factors to be considered in determining whether a warrantless entry is justified by the exigent circumstance that evidence is about to be destroyed: (1) whether the police had the opportunity to seek a warrant, and (2) whether the danger of destruction of the evidence was reasonably foreseeable. The trial court, however, rejected *Mann* as being controlling and relied solely on *Humphrey* in denying Hamilton's motion to suppress.

On appeal, Hamilton argues that the trial court erred in denying his motion to suppress evidence because warrantless entries into private homes are presumptively unreasonable under the Fourth Amendment, and the situation in this case did not constitute the kind of exigent circumstances that would excuse the

failure to seek a warrant. He again cites *Mann*, asserting that the holding in *Mann* limited *Humphrey*, and argues that because the police had ample time to secure a warrant, the trial court erred in finding that there were exigent circumstances. We agree.

In reviewing a circuit court's denial of a motion to suppress evidence, this court conducts a de novo review based on the totality of the circumstances. *See Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003). We review findings of historical facts for clear error, and we determine whether those facts give rise to reasonable suspicion or probable cause, giving considerable weight to the findings of the trial judge in the resolution of evidentiary conflicts and deferring to the superior position of the trial judge to pass upon the credibility of witnesses. *See id.*

It is axiomatic that a warrantless entry into a private residence is presumptively unreasonable under the Fourth Amendment. *Latta v. State*, 350 Ark. 488, 88 S.W.3d 833 (2002). However, a warrantless intrusion may be constitutional if, at the time of entry, there exists probable cause and exigent circumstances. *See Humphrey v. State, supra*. "Exigent circumstances are those requiring immediate aid or action, and, while there is no definite list of what constitutes exigent circumstances, several established examples include the risk of removal or destruction of evidence, danger to the lives of police officers or others, and the hot pursuit of a suspect." *Id.* at 767, 940 S.W.2d at 867.

We believe that Hamilton's reliance on *Mann* is eminently sound. In the instant case, more than three hours had passed from the time that Minney arrived at Hamilton's doorstep until the decision to kick in his door was finally made. That was more than enough time to secure a warrant. As our supreme court noted in discussing *Duchi*, "clearly, if officers have the opportunity to seek a warrant, the situation is not one of urgency." *Mann*, 357 Ark. at 169, 161 S.W.3d at 832. Moreover, that length of time that the officers lingered outside Hamilton's dwelling was more than sufficient for Hamilton to tamper with the evidence if that was his intention, and indeed, he did wash the blood off his knife. The most significant other item of evidence that Minney was supposedly concerned with, Hamilton's shirt, remained in view of the police during their more than three-hour vigil outside his door. Again, citing *Duchi* with approval, our supreme court quoted its discussion of what constitutes the type of "urgency of the situation" that would justify suspension of the warrant requirement:

"The warrant requirement is suspended when — in the press of circumstances beyond a police officer's control — lives are threatened, a suspect's escape looms, or evidence is about to be destroyed." *Id.* at 169, 161 S.W.3d 832. In the instant case, the evidence may have already been tampered with or was not likely to be when the police kicked in the door. Accordingly, we hold that the trial court erred in failing to suppress the fruits of the unlawful intrusion into Hamilton's home.

■ In finding error in the trial court's denial of Hamilton's motion to suppress, we are mindful that the State has argued on appeal that even if the search was unlawful, in light of the overwhelming evidence that Hamilton stabbed Fortune, the trial court's error was harmless. However, given that this issue is likely to arise on retrial, we reject the State's contention that it was harmless in this case. Furthermore, the identity of the alleged perpetrator was not an issue; it is axiomatic that in any case where a criminal defendant raises a justification defense, his identity as the alleged perpetrator is a given. Accordingly, we hold that the evidence gathered in the illegal entry into Hamilton's residence was erroneously admitted and should not be admitted on retrial.

Regarding Hamilton's third argument, that the trial court abused its discretion by denying his motion to continue the trial to allow a material defense witness to appear, we believe that this situation is unlikely to recur on retrial, and therefore we decline to address it. *See id.*

Reversed and remanded.

Bird and Griffen, JJ., agree.