Cite as 2023 Ark. App. 7

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CR-22-171

| | | |
|---|---|---|
| DARTANYA STAPLETON | | Opinion Delivered January 18, 2023 |
| | APPELLANT | APPEAL FROM THE CLARK COUNTY CIRCUIT COURT [NO. 10CR-19-47] |
| V. | | |
| STATE OF ARKANSAS | | HONORABLE BLAKE BATSON, |
| | APPELLEE | JUDGE |
| | | AFFIRMED |

## N. MARK KLAPPENBACH, Judge

Following a jury trial in the Clark County Circuit Court, Dartanya Stapleton was found guilty of first-degree murder and a firearm enhancement and was sentenced to thirty-five years' imprisonment. On appeal, Stapleton challenges the sufficiency of the evidence to support the firearm enhancement, the denial of her motion to suppress, the exclusion of certain testimony, and the denial of her motions for a curative instruction and mistrial. We affirm.

Fifty-eight-year-old John Ratton was reported missing on January 23, 2019. Police received information that earlier in the day, Ratton had driven Stapleton and Brock Henthorn to the home Stapleton shared with her brother, William Pennino. Rick Loy of the Clark County Sheriff's Department spoke to Stapleton, who reported that Ratton had

given her and Henthorn a ride and then Ratton had left in a hurry before noon. Two witnesses subsequently reported to law enforcement that they were inside the home with Pennino that day when a car pulled up and honked. According to the witnesses, Pennino went outside, and they looked out the window and saw Stapleton and Henthorn beating and kicking a man who was not fighting back. Pennino then came back inside, got a rifle, and told the witnesses to stay inside. The witnesses saw the car being driven down to a second driveway, and Pennino walked in that direction. The witnesses then heard gunshots.

Law enforcement returned to Stapleton's home that night. Clark County Sheriff Jason Watson testified that officers observed blood in the location the witnesses said they saw Ratton being attacked, and a trail of blood approximately 130 feet long led into a wooded area. There, police found a shovel, blood, and disturbed ground indicating possible digging. Pennino and Stapleton were arrested that night, and a knife was recovered from Stapleton when she was searched at the jail. It was later determined that Ratton's blood was on that knife. Pennino later showed law enforcement where Ratton's body was buried and told them where to find Ratton's burned car. Ratton had four gunshot wounds to the back of his head and a six-to-seven-inch cut across the front of his neck. Stapleton, Pennino, and Henthorn were all charged with murder.

Stapleton was interviewed by Sheriff Watson and Investigator Roy Bethell on January 24. In the interview, Stapleton admitted that she was "actually the one that slit his throat" and that she shot Ratton three times in the back of the head with the gun Pennino brought outside. She said that there was no specific reason for the killing, but she "just kind of

wanted to." Stapleton said that as they were sitting in the driveway in Ratton's car, she reached up from the backseat and slit Ratton's throat. She described his extensive bleeding as "awesome" but said that she felt bad that he was suffering, so she shot him. She said that the knife found on her when she came to jail was the one she had used. She claimed that Henthorn "really didn't want to do it."

Prior to trial, Stapleton moved to suppress her statements to police and the knife recovered from her person. She alleged that law enforcement had illegally arrested her inside her home without an arrest warrant. Following a hearing in which law enforcement testified that Stapleton was arrested on her porch, the circuit court denied the motion to suppress. The video and transcript of Stapleton's interview were admitted into evidence at trial.

At trial, the State presented the testimony of Teresa Pollock. Pollock testified that when she and Stapleton were incarcerated in the same jail in July 2019, Stapleton admitted that she had killed a man and described the killing in detail. According to Pollock, Stapleton told her that she and a man named Brock left her home to get cigarettes and went to an old man's house looking for someone to give them a ride. While in the man's living room, Stapleton and Brock talked about how she had been thinking about killing someone for a while, and she tried to talk Brock into doing it. After the man had taken them to get cigarettes and back to Stapleton's home, Stapleton told Brock, who was in the front seat, to "do it." After Brock refused, Stapleton called him a "pussy," and she slit the man's throat from behind. Brock then got out of the car, pushed the man to the passenger seat, and drove the car to another driveway. The man then got out of the car, and Brock put him in the

3

back seat. Stapleton's brother heard the commotion, came outside and was mad, then went back inside and got a gun. Stapleton told Pollock that Pennino had shot the man. At the time of trial, Pollock was imprisoned for false imprisonment and aggravated assault. She testified that she was not offered a sentence reduction and did not receive any consideration for her testimony. Pollock said that she simply notified the Clark County authorities and provided a handwritten statement in August 2019.

Stapleton testified that she started hanging out with Henthorn four days before the murder when he came to her home and used methamphetamine with her, Pennino, and her friend Reshelle Murillo. Stapleton testified that she had met Henthorn once before and had heard he was possibly violent. Henthorn was asked to leave her home after he became paranoid and physically attacked another friend. Stapleton claimed that at this point, she became afraid of him. Stapleton said that a couple of days later, she was in a car with Pennino, Henthorn, and another friend when Henthorn choked the other friend. Stapleton continued to use methamphetamine with Henthorn, and he went with her to visit her grandmother in the hospital.

Stapleton testified that at around 2:00 or 3:00 a.m. on January 23, Henthorn insisted that the two of them walk to a friend's house in the rain to get a ride to the store for cigarettes. The friend could not give them a ride, but a neighbor took them to Ratton's home, where Henthorn insisted they wait for the store to open. Ratton was sleeping, but other people in the home were awake. Stapleton testified that Henthorn was acting paranoid, accusing her of things, and talking about planning to hurt someone. She said that he had talked about

4

killing the woman who gave them a ride and killing people who were at Ratton's home. Stapleton said that he asked her to kill one woman, but she declined, and Henthorn became more insistent about killing someone as the night went on. Eventually, Henthorn woke up Ratton, who gave them a ride to the store and to Stapleton's house.

Stapleton testified that Henthorn told her that if she did not do what he said, he would make her family watch as he killed her, and then he would kill her family. Stapleton said that when they parked, Henthorn told her, "You're going to do it." She initially refused, but she realized by the look he was giving her that he was going to kill her if she did not do it. Accordingly, she reached around the front seat with her pocketknife and cut Ratton "a little" on his neck. Stapleton said that Ratton honked the horn and tried to get out of the car, and Henthorn pulled out his own knife and cut Ratton's throat after moving him to the passenger seat. She said that Henthorn punched Ratton repeatedly as Ratton tried to escape again, and she tried to pull Henthorn off of him. Stapleton said that Pennino came outside with a rifle and shot Ratton in the back of his head three times.

Stapleton admitted that she did not entirely tell the truth to the police. She claimed that she was still high when she gave her statement, that she was trying to protect her brother, and that she was worried Henthorn would kill her if he knew that she told the police he did it. She claimed that the knife found on her was the one Henthorn had used and that he had given it to her to clean, but she forgot about it. Stapleton claimed that she did not confess to Pollock and that Pollock's statement to police looked identical to Henthorn's statement; thus, she asserted that Pollock must have stolen her discovery file from under her

5

bed. On cross-examination, Stapleton acknowledged that she had denied to the police that she was taking "the rap" for her brother, and she told police that Henthorn was "really not a bad guy."

Cynthia Gilbert testified on behalf of the defense that she had ended her close friendship with Henthorn because he had a temper, and she was a little scared of him. Near the time of the murder, Gilbert had heard Henthorn talk about planning to kill someone. Reshelle Murillo and Eli Bergess also testified that they had heard Henthorn express that he wanted to kill someone and that he had been acting paranoid in the days leading up to the murder. Bergess testified that he was in Stapleton's home when he heard a horn honk, and he looked out the window and saw Stapleton and Henthorn at Ratton's car. Bergess said that it looked like Stapleton was trying to help Ratton.

The jury was instructed that Stapleton asserted the defenses of duress and of extreme emotional disturbance and that she could be convicted as an accomplice. Stapleton was found guilty of first-degree murder and employing a firearm as a means of committing murder. She was sentenced to thirty-five years' imprisonment.

## I. *Firearm Enhancement*

Stapleton first argues that there is insufficient evidence to support her conviction of the firearm enhancement because her confession to shooting Ratton was not corroborated by any other evidence. Arkansas Code Annotated section 16-89-111(d)(1) (Supp. 2021) provides that a confession of a defendant, unless made in open court, does not warrant a conviction unless accompanied by other proof that the offense was committed. The

6

requirement for other proof is sometimes referred to as the corpus delicti rule and requires only proof that the offense occurred and nothing more. *Meadows v. State*, 2012 Ark. 57, 386 S.W.3d 470. In other words, under the corpus delicti rule, the State must prove (1) the existence of an injury or harm constituting a crime and (2) that the injury or harm was caused by someone's criminal activity. *Id.*

Here, Stapleton confessed to police that she had shot Ratton in the back of his head, and the medical examiner testified that Ratton had four gunshot wounds to the back of his head. This proof satisfies the corpus delicti rule. Stapleton argues that other evidence indicated that it was Pennino who had shot Ratton. However, proof that she fired the shots is not required. To corroborate a confession, the State is not required to connect the defendant to the criminal act through independent evidence; rather, the State need only show that the offense occurred. *Meadows*, *supra*. The proof established that Ratton sustained gunshot wounds to the back of his head due to someone's criminal activity, and this constitutes sufficient evidence to corroborate Stapleton's confession.

## II. *Motion to Suppress*

Stapleton contends that the circuit court erred in denying her motion to suppress her confession and the knife found on her because her arrest was illegal. Testimony at the suppression hearing established that after receiving the witnesses' accounts, several law enforcement officers went to Stapleton's house to investigate. Sheriff Watson and other officers followed the blood trail while Deputy Loy and Montgomery County Sheriff David White knocked on the door. Pennino answered the door and was arrested on an outstanding

7

warrant. Loy testified that after he had searched Pennino and handed him off to another officer, he turned his attention back to the porch where Stapleton was already in custody. Loy testified that he never entered the house during the arrests, and he did not see anyone else enter the house to make the arrests. Watson testified that after the officers found the shovel and disturbed ground, he advised them to retreat so they could apply for a search warrant. Watson then walked toward the porch where he saw Pennino being arrested and Stapleton standing on the porch screaming that Ratton was not there and that the police had no business being there. Watson told Sheriff White to arrest Stapleton, and White did so on the porch.

Stapleton testified that when law enforcement knocked on her door, Pennino answered the door, and she stepped away to put some things up. She said that when she walked back toward the door, she saw at least two officers inside the house who were asking Pennino to step outside. She said that after Pennino stepped outside, several officers came inside the house and started asking her questions about Ratton. Stapleton testified that she was then arrested inside the house and taken outside.

The circuit court denied the motion without providing any reasoning. In reviewing the circuit court's denial of a motion to suppress evidence, we make an independent examination based on the totality of the circumstances and reverse only if the decision is clearly against the preponderance of the evidence. *Stutte v. State*, 2014 Ark. App. 139, 432 S.W.3d 661.

On appeal, Stapleton argues that her arrest was illegal because she was either arrested inside her home or because the officers asked her to step outside to arrest her. *See Norris v. State*, 338 Ark. 397, 993 S.W.2d 918 (1999) (A warrantless felony arrest in the home is prohibited under the Fourth Amendment absent probable cause and exigent circumstances.); *Lamb v. State*, 23 Ark. App. 115, 119, 743 S.W.2d 399, 401 (1988) ("We have held that this rule is applicable where the arrest is accomplished without an entry by police officers who knock on a person's door and ask him to step outside."). Although there was no testimony that officers asked Stapleton to come outside, Stapleton notes that in the State's response to her motion to suppress, the State wrote that law enforcement "requested Defendant to come out after knocking on the door." Stapleton argues that this constitutes a judicial admission for which no evidence is needed; however, she did not preserve this argument for appeal. Although Stapleton testified that she was arrested inside her home, the circuit court was free to believe Sheriff Watson's testimony that Stapleton was standing on the porch when he returned from finding the blood trail into the woods and made the order to arrest her.[1] We hold that the circuit court's denial of Stapleton's motion to suppress was not clearly against the preponderance of the evidence.

III. *Exclusion of Testimony Regarding Henthorn Fighting*

---

[1] Stapleton contends that we should not give any factual deference to the circuit court because it made no factual findings in denying the motion to suppress, and it denied her subsequent motion for findings. However, she cites no authority that requires a circuit court to provide such findings.

Stapleton argues that the circuit court erred in excluding certain testimony from Reshelle Murillo. Murillo testified that she met Henthorn a few days prior to the murder, and defense counsel asked her if there was an occasion where she saw Henthorn in a fight. Murillo answered in the affirmative, and defense counsel asked her to tell the jury about that. The State objected, arguing that Murillo's seeing Henthorn engaged in a fight was not relevant. Defense counsel argued that Stapleton saw the fight and that it was relevant to her duress defense. The court sustained the objection.

On appeal, Stapleton maintains that Murillo's testimony regarding Henthorn's fighting individuals in front of Stapleton was relevant to her defense that she legitimately feared Henthorn when he threatened her. She argues that evidence of her knowledge of Henthorn's specific instances of violence was admissible, and she claims that it was critical that Murillo's testimony corroborate her own testimony about the fights. The State first contends that the argument is not preserved because Stapleton did not proffer Murillo's testimony. While Stapleton did fail to make a formal proffer, it is well settled that an offer of proof is not necessary when the substance of the evidence sought to be introduced is apparent from the context within which the questions are asked. *Pryor v. State*, 71 Ark. App. 87, 27 S.W.3d 440 (2000). During arguments to the court, defense counsel stated, "If this person -- and if you want me to say: 'Did she see it?' 'Yes.' 'And was Dartanya there?' 'Yes.' 'Then describe it,' I'll do that." Accordingly, we hold that Stapleton did preserve an argument regarding testimony that Stapleton was present on an occasion when Henthorn was fighting someone. *See Pryor*, *supra* (holding that the substance of the evidence was readily

apparent from the questions posed to a prior witness and defense counsel's argument to the circuit court).

A circuit court's evidentiary ruling will not be reversed in the absence of an abuse of discretion and a showing of prejudice. *Taffner v. State*, 2018 Ark. 99, 541 S.W.3d 430. Even if it was erroneous to exclude Murillo's testimony that Stapleton was present when Murillo saw Henthorn fighting, we hold that Stapleton was not prejudiced by this ruling. Stapleton testified that she and Murillo were present when Henthorn attacked their friend about four days before the murder. She also testified that she, but not Murillo, saw Henthorn attacking another friend a couple of days later. Murillo was allowed to testify that in the time she was around Henthorn, she saw him fighting someone, and he expressed that he wanted to kill someone. Cynthia Gilbert, Eli Bergess, and Stapleton herself also testified that they had heard Henthorn talk about planning to kill someone, that he had been acting paranoid, and that he has a temper. In light of all the evidence that was admitted regarding Henthorn's violent character, Stapleton cannot demonstrate prejudice from the exclusion of Murillo's testimony that Stapleton was present at a single fight she witnessed. An argument as to any other testimony Murillo may have given was not preserved for appeal.[2]

IV. *Exclusion of Testimony Regarding Similarities in Witness Statements*

---

[2]Stapleton's brief states that Murillo was prevented from corroborating Stapleton's own testimony about multiple fights Henthorn engaged in on the "night of the murder." However, Stapleton testified that one fight, for which Murillo was present, occurred four days before the murder, and the other fight, for which Murillo was not present, occurred "about a day-and-a-half after that."

Stapleton attempted to question Sheriff Jason Watson about "some unusual similarities" in the statements given to him by Pollock and Henthorn. The State objected to any questions about any statements made by Henthorn under Arkansas Rules of Evidence 402, 403, and 801. Stapleton argued that the line of questioning was relevant to show that Pollock's knowledge of the case came from reading Stapleton's discovery file, not from Stapleton's confessing to her. She argued that this was extremely probative and that it was not prejudicial because nothing from the statements was being offered for the truth of the matter asserted. Because nothing was being offered for the truth of the matter, she argued that it was not hearsay. The objection was sustained, and Stapleton proffered Pollock's written statement, the transcript of Henthorn's interview, and a document created by the defense purporting to show similarities in the two statements. On appeal, Stapleton repeats her arguments that the statements were relevant, not unfairly prejudicial, and not hearsay. We hold that Stapleton cannot show prejudice from the exclusion of this evidence.

According to both Henthorn's account to police and Stapleton's alleged account to Pollock, Ratton probably did not hear them talking about killing him because he was "old," and Henthorn declined Stapleton's request that he "do it." They both said that Henthorn tried to choke Ratton but then stopped, that Pennino was mad and asked why they had brought this "shit to the house," and that Pennino had shot Ratton in the back of his head. According to both of them, the first place Henthorn tried to dig a hole was too rocky or too hard, and Stapleton stayed at the house when Henthorn and Pennino disposed of the car and buried Ratton's body in the woods.

Although the State was precluded from questioning Sheriff Watson about the alleged similarities, Stapleton's defense that Pollock's account was stolen from Henthorn's interview was submitted to the jury through defense counsel's questioning of Pollock and through Stapleton's testimony. After having Pollock confirm statements she had made in her written statement, defense counsel stated as follows:

> And what I want you to tell the Jury now is that why all of those statements are in Brock's statement to the police, and nowhere else in the file. Did you read Brock's statement to the police, and then call the ~ and then tell Jason Watson the story that you made up?

Defense counsel later stated that "I know you [read her discovery file] because it's identical to Brock's statement." Stapleton testified that she did not confess to Pollock and that Pollock must have stolen the discovery file from under her bed to know the things she testified about. Stapleton said that Pollock's statements looked identical to Henthorn's statement.

The State argues that repeating the same inquiries to Sheriff Watson would have been cumulative to Pollock's testimony and that the proposed examination of Watson would have reinforced that Pollock was telling the truth because she recounted the same story as Henthorn. We agree that even if Henthorn's statements were read to the jury, there is nothing in the list of alleged similarities that cannot be explained by the fact that two participants, Henthorn and Stapleton, were recounting the same incident to the police and Pollock, respectively. Rather than containing "unusual similarities" or "identical"

statements, their accounts merely tell the same story. Accordingly, Stapleton's defense was not prejudiced by this exclusion.

V. *Exclusion of Testimony Regarding a Question Henthorn Asked*

Prior to trial, the State moved to exclude testimony that Henthorn had asked Murillo if she wanted him to kill her friend. The State argued that the question was hearsay. Stapleton disputed that a question could be hearsay and argued that the question was admissible as a statement of the declarant's then existing state of mind, such as his intent or plan. The circuit court granted the State's motion without explanation. On appeal, Stapleton maintains that a question is not hearsay because it is not a statement offered in evidence to prove the truth of the matter asserted. Alternatively, she argues that if it is hearsay, it falls under the exception in Rule 803(3) as a statement of the declarant's then existing state of mind. Stapleton argues that her defense was prejudiced by the exclusion of the question because it would have shown Henthorn's desire and plan to kill someone and corroborate her testimony that she acted out of fear of Henthorn.

We agree with the State that Stapleton cannot show prejudice as a result of any error. Although Stapleton was not permitted to ask Murillo if Henthorn posed such a question to her, she was allowed, over the State's objection, to ask Murillo if Henthorn had told her he planned to kill someone. Murillo testified that Henthorn had expressed that he wanted to. Furthermore, Eli Bergess and Cynthia Gilbert both testified that they had heard Henthorn talk about planning to kill someone. This testimony allowed Stapleton to show Henthorn's desire and plan to kill someone and corroborated Stapleton's own testimony. We agree with

14

the State that the difference between the questions counsel was allowed to ask and the question that the court excluded is negligible.

VI. *Closing Argument*

During the State's second closing argument, Stapleton objected following these remarks by the prosecutor:

> They want you to disregard Teresa Pollock's testimony. What did Teresa Pollock gain by trotting in here in ADC white and sitting down and telling you guys what the Defendant told her in the cell, other than being labeled a snitch when she gets back to ADC? Nothing. Nothing. Now, there's these suggestions that maybe she – there's no evidence that she received any consideration for that. So what is her motive? What's she doing? The Defendant is looking to leverage that for motivation like Teresa Pollock? They don't call Sheriff Watson to come take a statement. They call their attorney and say, "See if you can work me out a deal."

Stapleton asked for a curative instruction and a mistrial because the prosecutor had told the jury without any evidence that "attorneys are the ones that would leverage a deal, and you wouldn't call the sheriff." The court overruled the objection.

Stapleton argues that the prosecutor's statement was outside the evidence adduced at trial because there was no testimony concerning the normal method of giving information to authorities in exchange for a deal. In reviewing closing arguments, the circuit court has discretion to control closing argument and is in a better position to determine the possibility of prejudice by observing the argument firsthand. *Stewart v. State*, 2012 Ark. 444. We will not reverse the action of the circuit court in matters pertaining to its controlling, supervising, and determining the propriety of the arguments of counsel in the absence of manifest gross abuse. *Id.* Closing arguments must be confined to questions in issue, the evidence

15

introduced during the trial, and all reasonable inferences and deductions that can be drawn therefrom. *Id.* When an attorney's comment during closing arguments directly reflects, or is inferable from, testimony at trial, there is no error. *Id.*

In her testimony, Pollock denied that she had received any consideration for providing a statement and agreed that she had "just notified the Clark County authorities and told Sheriff Watson." The defense challenged her credibility by noting the charges she faced in three counties before she provided her statement and the lesser offenses she ultimately pleaded guilty to, but there was no evidence that Pollock had contacted her attorney and asked for a deal. In denying defense counsel's accusation that she stole Stapleton's discovery file, Pollock testified that she had never seen an inmate with a discovery file and had never even seen her own because she lets her lawyers handle those matters. The prosecutor's closing argument pointed out that Pollock had not contacted her attorney for a deal despite her testimony that she lets her lawyers handle her cases. It was a reasonable inference from the evidence that a defendant "like Teresa Pollock" would have asked her attorney for a deal if that was her motivation. We hold that the circuit court did not abuse its discretion in overruling Stapleton's objection to the State's closing argument. To the extent Stapleton argues that the State improperly vouched for Pollock's credibility, this argument was not preserved for review. *See Noel v. State*, 331 Ark. 79, 960 S.W.2d 439 (1998).

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Short Law Firm*, by: *Lee D. Short*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Jason Michael Johnson* and *Christopher R. Warthen*, Ass't Att'ys Gen., for appellee.