Cite as 2025 Ark. App. 545

# ARKANSAS COURT OF APPEALS
## DIVISION IV
### No. CR-24-718

| | | |
|---|---|---|
| JAMIE LYNN MARKS | | Opinion Delivered November 12, 2025 |
| | APPELLANT | |
| V. | | APPEAL FROM THE FAULKNER COUNTY CIRCUIT COURT [NO. 23CR-22-1243] |
| STATE OF ARKANSAS | | HONORABLE TROY B. BRASWELL, JR., JUDGE |
| | APPELLEE | |
| | | AFFIRMED |

## CASEY R. TUCKER, Judge

Jamie Lynn Marks appeals his convictions of committing a terroristic act and possession of a firearm by certain persons in Faulkner County Circuit Court. He makes two arguments on appeal: that the Faulkner County Circuit Court lacked jurisdiction because the alleged crime occurred in Pulaski County and that the circuit court erred in denying his motions to suppress. We affirm.

On December 14, 2022, Marcus McMillan was living in his camper on Marks's property at 57 Moody Road, which according to testimony, is in Faulkner County. In addition to the camper, McMillan had a white truck and a black truck that he parked in the yard. McMillan had been living in Marks's yard for approximately three to six months. Marks had asked McMillan to leave, but McMillan remained on the property.

When McMillan returned home to his camper on the morning of December 14, Marks fired at him and his truck with a shotgun. McMillan dialed 911 and told the dispatcher that Marks had fired on him with "a shotgun or something" and that in addition to his truck being hit, he was hit by glass or metal but that he was okay. The 911 operator informed McMillan that she would have a deputy head his way. McMillan told the dispatcher that Marks was headed his direction but no longer had a gun in his hand.

Investigator Nathan Nicodemus of the Faulkner County Sheriff's Office responded to the scene. He parked at a distance from the scene and approached slowly, taking cover while doing so since he was responding to a shooting and the location of the shooter was unknown. Nicodemus ultimately made contact with Marks, who had returned inside his home. When Marks exited the home and did not appear to have a weapon, Officer Nicodemus lowered his weapon. He then patted down Marks, who did not have any weapons on him. Marks and Nicodemus had a short conversation in which Marks expressed that he believed Nicodemus was there because he (Marks) had shot at someone in his front yard. Marks told Nicodemus that he had shot at McMillan because he was living in his yard and he wanted him gone. Nicodemus immediately took Marks into custody upon hearing his comments. As Nicodemus was walking Marks to the patrol car, Marks spontaneously commented, "It was just birdshot. It wouldn't kill him. If it would, he would be laying in the yard." Nicodemus looked at the scene and inspected McMillan's white truck, which had small indentions consistent with birdshot on the passenger-side fender area, front, and hood.

2

Nicodemus testified that he and the officers who arrived after him searched the property after obtaining a search warrant. In addition to other firearms found in Marks's main residence, the officers found a shotgun capable of firing birdshot lying on an oversized chair in the living room. In a tub on the front porch, they found two spent shotgun shells. In Marks's barn, which was about fifty to sixty yards from his house, the officers found at least three rifles hanging on walls in addition to other rifles and a shotgun. They also found what appeared to be a "re-loading" room containing a set-up to load ammunition cases with gunpowder and projectiles.

Corporal Brian Moody of the Faulkner County Sheriff's Office is a patrol supervisor who responded to the shooting call at 57 Moody Road. When he arrived, Nicodemus was putting Marks in the car and Mirandizing him. Moody spoke with McMillan, who told him that when he pulled up in his truck, Marks walked out of his house and fired two or three rounds at him. Moody inspected the truck, which appeared to have been hit with birdshot. On his way toward Marks's house, Moody passed a gray Mazda truck that was backed up toward Moody's porch. Moody looked in the window of the truck and saw what appeared to be a rifle lying on the seat. At that point, the officers stopped and waited for the Criminal Investigation Division to come to the scene. Once the CID arrived with the warrant, Officer Moody entered Marks's home. In the bedroom, he found a holstered pistol lying in an open area of a desk.

Investigator Nathan Kelley, who was the lead investigator on the case, arrived on the scene after the other officers. Kelley spoke with McMillan and, upon inspecting the truck,

could tell it had been hit by birdshot. When he learned the nature of the incident and that the suspect was in custody, he determined that he needed to obtain a search warrant. Kelley had Investigator Michael Lee assist him in obtaining the search warrant, giving Lee information for the affidavit for search warrant.

Lee helped execute the search warrant on 57 Moody Lane. He primarily searched Marks's barn, where he found a gun safe containing approximately fifteen to seventeen guns. He also found the room in the barn containing three or four guns and ammo-manufacturing equipment. The officers executing the search warrant found twenty-eight to twenty-nine firearms on Marks's property.

Marks was charged with simultaneous possession of drugs and firearms, committing a terroristic act, and possession of a firearm by certain persons. The State later dismissed the charge of possession of drugs and firearms and proceeded on the other two charges.

Marks moved to suppress physical evidence and statements, alleging that Marks was arrested at his home without a warrant, forced from his home at gunpoint, and questioned without the benefit of *Miranda* warnings. Marks urged that any evidence seized pursuant to Marks's warrantless arrest was subject to exclusion unless the warrantless seizure was justified by probable cause and exigent circumstances. He further argued that law enforcement obtained a search warrant on the basis of information that the officers obtained as the result of his unlawful arrest. After a hearing, the court denied this motion to suppress.

Marks filed a second motion to suppress alleging that the evidence obtained incidental to Marks's arrest or seizure should be suppressed because the scope of the search

4

was beyond that permitted by Ark. R. Crim. P. 12.1 through 12.6 and because the application for the search warrant was based on information obtained as a result of that unlawful search. He further argued that the search warrant was obtained based on hearsay and that the scope of the search was overbroad and lacked particularity of the places and things to be searched. After a hearing, the court denied the motion to suppress.

The jury trial was held on April 18, 2024. The jury found Marks guilty on both counts. It fixed Marks's sentence at twenty-five years in the Arkansas Division of Correction for possession of a firearm and fifteen years for terroristic threatening. The court sentenced Marks accordingly, ordering that the sentences run consecutively for a total of forty years. Marks timely appealed.

I. *Jurisdiction of the Faulkner County Circuit Court*

Appellant claims that the location of the offense for which he was tried was in Pulaski County, and thus, that the Faulkner County Circuit Court did not have jurisdiction to hear his case. We disagree.

Arkansas Code Annotated section 16-88-105(b) (Supp. 2025) states: "The local jurisdiction of circuit courts shall be of offenses committed within the respective counties in which they are held." Arkansas Code Annotated section 5-1-111(a) (Repl. 2024) provides that no person may be convicted of an offense unless jurisdiction and venue are proved beyond a reasonable doubt. Ark. Code Ann. § 5-1-111(a)(2), (3). However, the State "is not required to prove jurisdiction or venue unless evidence is admitted that affirmatively shows that the court lacks jurisdiction or venue." Ark. Code Ann. § 5-1-111(b); *see also Roberts v.*

5

*State*, 2023 Ark. App. 115, 662 S.W.3d 668.  As explained by this court in *Penix v. State*, 2022 Ark. App. 407, 654 S.W.3d 828, there must be positive evidence that the offense occurred outside the jurisdiction of the court before the State can be called upon to offer any evidence on the question of jurisdiction or venue.  *Id.* at 14, 654 S.W.3d at 836.  "The test is whether the record contains substantial evidence showing that the offense, or elements of it, occurred within the jurisdiction and venue of the court."  *Id.* (citations omitted).

Marks has not produced positive evidence that the offenses with which he was charged occurred outside the venue and jurisdiction of the Faulkner County Circuit Court. He merely references the address of the property where the offenses occurred and makes the conclusory statement, "This property is obviously located in Pulaski County, Arkansas."  He offers no evidence to support this statement.

On the other hand, the record contains substantial evidence that 57 Moody Road is in Faulkner County.  Officer Nicodemus testified that the address is in Faulkner County. When McMillan dialed 911, the Faulkner County 911 operator answered, and the Faulkner County Sheriff's Office responded to the scene of the crimes.  There is no evidence contradicting that the address is in Faulkner County.  Marks asserts in his brief that the mailing address is in Pulaski County, but this is neither evidence nor determinative of whether the location is actually in Faulkner County.

Because the only evidence in the record supports the conclusion that the offenses occurred in Faulkner County, this case was properly heard in the Faulkner County Circuit Court.

## II. *Denial of Motions to Suppress*

Marks asserts that the circuit court erred in denying his motion to suppress the fruits of his arrest and subsequent search because the initial warrantless arrest violated Arkansas law and the Fourth Amendment. His argument is that the initial arrest was illegal; thus, all of his statements as well as the firearms found as a result of the search were tainted. Marks is mistaken.

In reviewing a circuit court's denial of a motion to suppress, the appellate court conducts an independent examination of the totality of the circumstances and reverses only if the decision is clearly against the preponderance of the evidence. *Stapleton v. State*, 2023 Ark. App. 7, 659 S.W.3d 523; *Hilton v. State*, 80 Ark. App. 401, 96 S.W.3d 757 (2003). "A determination of the preponderance of the evidence depends heavily on questions of credibility and weight to be given the testimony, and this court defers to the superior position of the trial court on those questions." *Hilton*, 80 Ark. App. at 405, 96 S.W.3d at 760.

The Fourth Amendment prohibits warrantless felony arrests absent probable cause and exigent circumstances. *Stapleton*, *supra*. This rule also applies when officers knock on a person's door and ask him to step outside. *Id.* Probable cause is determined by applying a totality-of-the-circumstances test. It exists only when the facts and circumstances that are within the officers' knowledge—and that are based on reasonably trustworthy information— are sufficient to make a person of reasonable caution believe that an offense has been or is being committed. *Steinmetz v. State*, 366 Ark. 222, 234 S.W.3d 302 (2006). Exigent

7

circumstances are those requiring immediate aid or action. *Id.* There is no exhaustive list of what constitutes an exigent circumstance, but some examples include the risk of removal or destruction of evidence, danger to the lives of police officers or others, the hot pursuit of a suspect, the commission of a grave offense, and the belief that the suspect is armed. *Id.*; *Humphrey v. State*, 327 Ark. 753, 940 S.W.2d 860 (1997). The State bears the burden of proving that warrantless activity was reasonable. *Robbins v. State*, 94 Ark. App. 393, 231 S.W.3d 79 (2006).

In the present case, McMillan called 911 immediately; according to what he told the dispatcher, he called within a minute of the shooting incident. He told the dispatcher where he was and who had shot at his truck and him. Dispatch advised Officer Nicodemus by radio that a male named Jamie Marks, who is a convicted felon, had shot at another male while he was in his vehicle on Marks's property. Nicodemus considered this a high-risk call because lives were in danger; thus, he initiated his lights and siren while heading to the scene. He arrived on the scene within ten to fifteen minutes of the incident. Nicodemus then did what is called "directing of the net"—the protocol used during high-risk calls when the officer is moving in stealth and does not want to give up his location but needs to keep the radio traffic clear in case the situation goes downhill, such as being fired on or having to use a duty weapon, so the officer can let dispatch and other deputies know.

Nicodemus parked away from Marks's residence, which is typical practice in what he referred to as a "hot call," meaning one that carries an elevated risk. Nicodemus armed himself with a rifle due to the risk of the suspect having a shotgun. He approached the house

while taking cover behind trees and vehicles. He then announced himself several times, telling Marks to come out with his hands up. After approximately two minutes, Marks appeared inside the house. Nicodemus did not know Marks and did not know whether there were others inside the house. He was not able to tell at that time whether Marks was armed. When Marks came to the door, the storm door was still closed, and due to the solid lower half of the door and the debris on the deck, Nicodemus could not see below Marks's waist to determine if he was armed. Nicodemus asked Marks several times to come down from the porch. When Marks did come down from the porch, Nicodemus could see he was not armed, so he lowered his rifle. Nicodemus testified that his intent in asking Marks to come out where he could see him was to determine whether he had any weapons. He stated that this is standard procedure.

Nicodemus was not sure at that point whether he was dealing with the suspect. He first realized he had the right man when he asked Marks why he was there, and Marks replied that McMillan was living in a camper on his property, and Marks had told him forty-five days previously that he needed to leave. Marks further explained to Nicodemus that McMillan had not left, so as he was pulling up in his vehicle he (Marks) shot a shotgun at him. At that point Nicodemus placed Marks in handcuffs and Mirandized him. After being Mirandized, Marks requested an attorney. Nicodemus did not ask any questions after the request. As he was walking Marks to the patrol car, Marks made the statement about it just being birdshot, which would not kill McMillan.

On these facts we cannot say that the circuit court clearly erred in denying the first motion to suppress. There was probable cause and exigent circumstances to warrant Nicodemus's command for Marks to exit his home and the subsequent arrest. Because the arrest was lawful, Marks's subsequent statements were not fruit of an illegal arrest. Likewise, the court did not err in denying Marks's motion to suppress the evidence seized pursuant to the search warrant. We affirm.

Affirmed.

ABRAMSON and VIRDEN, JJ., agree.

*Craig Lambert* and *Richard L. Hughes*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jason Michael Johnson*, Ass't Att'y Gen.; and *Mallory Wood*, Law Student Admitted to Practice Pursuant to Rule XV of the Rules Governing Admission to the Bar of the Supreme Court under the Supervision of *Jason Michael Johnson*, Ass't Att'y Gen., for appellee.